**UNITED STATES of America,**

v.

**Usama Bin LADEN, a/k/a "Usamah Bin–Muhammad Bin–Ladin," a/k/a "Shaykh Usamah Bin–Ladin," a/k/a "Abu Abdullah," a/k/a "Mujahid Shaykh," a/k/a "Hajj," a/k/a "Abdul Hay," a/k/a "al Qaqa," a/k/a "the Director," a/k/a "the Supervisor," a/k/a "the Contractor," Muhammad Atef, a/k/a "Abu Hafs," a/k/a "Abu Hafs el**

Masry," a/k/a "Abu Hafs el Masry el Khabir," a/k/a "Taysir," a/k/a "Sheikh Taysir Abdullah," a/k/a "Abu Fatimah," a/k/a "Abu Khadija," Ayman Al Zawahiri, a/k/a "Abdel Muaz," a/k/a "Dr. Ayman al Zawahiri," a/k/a "the Doctor," a/k/a "Nur," a/k/a "Ustaz," a/k/a "Abu Mohammed," a/k/a "Abu Mohammed Nur al-Deen," Mamdouh Mahmud Salim, a/k/a "Abu Hajer al Iraqi," a/k/a "Abu Hajer," Khaled al Fawwaz, a/k/a "Khaled Abdul Rahman Hamad al Fawwaz," a/k/a "Abu Omar," a/k/a "Hamad," Ali Mohamed, a/k/a "Ali Abdelseoud Mohamed," a/k/a "Abu Omar," a/k/a "Omar," a/k/a "Haydara," a/k/a "Taymour Ali Nasser," a/k/a "Ahmed Bahaa Eldin Mohamed Adam," Wadih El Hage, a/k/a "Abdus Sabbur," a/k/a "Abd al Sabbur," a/k/a "Wadia," a/k/a "Abu Abdullah al Lubnani," a/k/a "Norman," a/k/a "Wa'da Norman," a/k/a "the Manager," a/k/a "Tanzanite," Ibrahim Eidarous, a/k/a "Ibrahim Hussein Abdelhadi Eidarous," a/k/a "Daoud," a/k/a "Abu Abdullah," a/k/a "Ibrahim," Adel Abdel Bary, a/k/a "Adel Mohammed Abdul Almagid Abdel Bary," a/k/a "Abbas," a/k/a "Abu Dia," a/k/a "Adel," Fazul Abdullah Mohammed, a/k/a "Harun," a/k/a "Harun Fazhl," a/k/a "Fazhl Abdullah," a/k/a "Fazhl Khan," Mohamed Sadeek Odeh, a/k/a "Abu Moath," a/k/a "Noureldine," a/k/a "Marwan," a/k/a "Hydar," a/k/a "Abdullbast Awadah," a/k/a "Abdulbasit Awadh Mbarak Assayid," Mohamed Rashed Daoud Al-Owhali, a/k/a "Khalid Salim Saleh Bin Rashed," a/k/a "Moath," a/k/a "Abdul Jabbar Ali Abdel–Latif," Mustafa Mohamed Fadhil, a/k/a "Mustafa Ali Elbishy," a/k/a "Hussein," a/k/a "Hussein Ali," a/k/a "Khalid," a/k/a "Abu Jihad," Khalfan Khamis Mohamed, a/k/a "Khalfan Khamis," Ahmed Khalfan Ghailani, a/k/a "Fupi," a/k/a "Abubakary Khal-fan Ahmed Ghailani," a/k/a "Abubakar Khalfan Ahmed," Fahid Mohammed Ally Msalam, a/k/a "Fahad M. Ally," Sheikh Ahmed Salim Swedan, a/k/a "Sheikh Bahamadi," a/k/a "Ahmed Ally," Defendants.

No. S(7)98CR.1023(LBS).

United States District Court,
S.D. New York.

Filed Under Seal Feb. 16, 2001.

Amended Feb. 16, 2001.

Unsealed and Redacted Feb. 16 2001.

See, also, 132 F.Supp.2d 198.

Mary Jo White, United States Attorney for the Southern District of New York, New York, Patrick J. Fitzgerald, Kenneth M. Karas, Paul W. Butler, Andrew C. McCarthy, Assistant United States Attorneys.

Frederick H. Cohn, Laura Gasiorowski, David Preston Baugh, New York, for Defendant Al-'Owhali.

David A. Ruhnke, Jeremy Schneider, David Stern, New York, for Defendant Khalfan Khamis Mohamed.

Sam A. Schmidt, Joshua L. Dratel, Kristian K. Larsen, New York, for Defendant El Hage.

Anthony L. Ricco, Edward D. Wilford, Carl J. Herman, Sandra A. Babcock, New York, for Defendant Odeh.

## OPINION [1]

SÀND, District Judge.

Presently before the Court are several motions to suppress evidence on behalf of Defendants Mohamed Rashed Daoud Al-'Owhali ("Al-'Owhali"), Khalfan Khamis Mohamed ("K.K.Mohamed"), and Mohamed Sadeek Odeh ("Odeh"). For the reasons described below, Al-'Owhali's motion is granted in part and denied in part, whereas K.K. Mohamed's motion is denied in its entirety.[2] We address Odeh's motions in a separate sealed opinion also filed today.[3]

### I. PROCEDURAL HISTORY

On October 13, 2000, Al-'Owhali moved to suppress the following: (1) all state-

---

**1.** This Opinion will be unsealed on February 16, 2001. Proposed redactions, if any, should be provided to the Court in advance of this date.

**2.** We orally delivered a preliminary ruling to this effect from the bench on January 29, 2001. This Opinion presents, in greater de-

tail, our findings of fact and conclusions of law.

**3.** We address in this separate opinion Al-'Owhali's claim that there was a lack of timely presentment as required by Rule 5 of the Federal Rules of Civil Procedure.

ments made during interrogation by U.S. law enforcement representatives while Al-'Owhali was held in Kenya under Kenyan custody; and (2) an out-of-court witness identification conducted by Kenyan authorities according to Kenyan procedure.[4] A hearing was held on December 12 and 14, 2000, although the motion itself was not fully submitted until December 29.[5]

Jury selection commenced on January 3, 2001. In a sealed opinion dated January 9, we granted the motion to suppress, addressing only the admissibility of statements made by Al-'Owhali to U.S. officials. One week later, on January 16, the Government moved for a reconsideration of our ruling and for a reopening of the suppression hearing. Because the Government's proffer sufficiently indicated the need to further develop the factual record, we granted the motion for reconsideration and withdrew our January 9 sealed opinion. The renewed hearing was held on January 23 and the motion became fully submitted at the close of business on January 26. To accommodate expeditious resolution of the suppression issue, jury selection was suspended between January 23 and 26.

Two days after our initial granting of Al-'Owhali's motion, K.K. Mohamed moved on January 11 to suppress statements he

made to U.S. agents while he was held in South Africa under South African custody. A hearing was specifically not requested. That motion became fully submitted at noon on January 24.

## II. FINDINGS OF FACT

### A. DEFENDANT AL-'OWHALI

We base the following findings of fact on the testimony of the FBI Special Agent ("S.A.") and Assistant U.S. Attorney (AUSA) who interrogated Al-'Owhali in Kenya, the testimony of the FBI Language Specialist who provided Arabic translation services during most of Al-'Owhali's interrogation, and the numerous stipulations, documents, and affidavits[6] admitted into evidence for purposes of the suppression hearings.

*The Arrest*

1. S.A. Gaudin is currently a member of the Joint Terrorist Task Force based in New York City ("JTTF"). On August 7, 1998, S.A. Gaudin was instructed to travel to Kenya and assist in the joint U.S.-Kenyan investigation of the U.S. embassy bombing in Nairobi that had occurred earlier that same day. He arrived in Nairobi on August 9. It was S.A. Gaudin's understanding that,

---

**4.** The Court had previously set a deadline of June 15, 2000 for the filing of suppression motions. The lateness of Al-'Owhali's motion was due to various circumstances that included a change of counsel for Al-'Owhali and his ambivalence as to whether the motion should even be made.

**5.** At the hearing, counsel for Al-'Owhali indicated that his client would not testify. Subsequent to the hearing's conclusion, counsel stated that Al-'Owhali, against the advice of counsel, in fact desired to testify. The matter was eventually resolved by a stipulation between the parties that, had Al-'Owhali actually testified, his testimony would have been consistent with the affidavit he submitted in support of his suppression motion.

**6.** With respect to AUSA [redacted]'s January 16, 2001 affidavit, we strike paragraphs 5–7 for lack of foundation. We also strike as legal argument paragraphs 3, 9–10, 11 (last 2 sen-

tences only), 16, 26, 29, 31, 37 (last 2 sentences only), 39, 55, 59, 63, 65–68, 69 (last sentence only), 70–71, and 74–81, as well as footnotes 1, 3 (last sentence only) 4, 9, 11, 12 (last 2 sentences only), 13, and 37. All objections based on hearsay are denied. (*See* Fed. R.Evid. 104(a) (court not bound by rules of evidence in preliminary proceedings concerning admissibility of evidence, except for issues of privilege); Fed.R.Evid. 1101(d)(1) (evidence rules inapplicable to "[t]he determination of questions of fact preliminary to admissibility of evidence when the issue is to be determined by the court under Rule 104"); *see also United States v. Raddatz,* 447 U.S. 667, 679, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) ("At a suppression hearing, the court may rely on hearsay and other evidence even though that evidence would not be admissible at trial.").)

while there, he was not authorized to make arrests.

2. On August 12, supervisors in Nairobi assigned S.A. Gaudin to pursue a tip concerning a suspicious individual staying at the Iftin Lodge, a hotel located in the Eastleigh neighborhood of Nairobi. Accompanying him were FBI Special Agent Steve Bongardt, New York City Police Detective Wayne T. Parola (also a member of JTTF), two officers of the Criminal Investigation Division of the Kenyan National Police ("CID"), and a Kenyan driver working for the Kenyan police. Together they drove to Iftin Lodge in a covered pickup truck.

3. At approximately 10 a.m. on August 12, the two CID officers entered Iftin Lodge, confronted the individual who was the subject of the lead, and arrested him without a warrant due to his lack of paper identification. Such an arrest was valid under Kenyan law.

4. The suspect was Defendant Al-'Owhali, though at that time he represented that his name was "Kalhad Salim" and that he was from Yemen.[7] On his person were $800 in U.S. currency, some amount of Kenyan cash, and a hospital stub indicating Al-'Owhali's receipt of medical treatment on August 7, the day of the bombing.

5. Al-'Owhali was removed from Iftin Lodge by the CID officers and placed into the rear of the truck. Seated inside were S.A. Gaudin, S.A. Bongardt, and Detective Parola; the three had never entered Iftin Lodge themselves.

6. Al-'Owhali was immediately transported without incident to CID headquarters in Nairobi, about a 25–30 minute drive. No questions were asked of the suspect, but S.A. Gaudin did speak in English to inform Al-'Owhali of the intended destination and to reassure him of his safety.

*The Advice of Rights and Subsequent Interrogation*

7. Interrogation of Al-'Owhali commenced at around 11 a.m. on August 12. Present were S.A. Gaudin, Detective Parola, and the two CID officers.

8. Detective Parola began the session by presenting the suspect with a modified advice of rights form written in English ("the AOR"). S.A. Gaudin admitted to having never seen an AOR like it before, although it is one apparently used often by U.S. law enforcement when acting overseas.

9. In its entirety, the AOR read as follows:

We are representatives of the United States Government. Under our laws, you have certain rights. Before we ask you any questions, we want to be sure that you understand those rights.

You do not have to speak to us or answer any questions. Even if you have already spoken to the Kenyan authorities, you do not have to speak to us now.

If you do speak with us, anything that you say may be used against you in a court in the United States or elsewhere.

In the United States, you would have the right to talk to a lawyer to get advice before we ask you any questions and you could have a lawyer with you during questioning. In the United States, if you could not afford a lawyer, one would be appointed for you, if you wish, before any questioning.

Because we are not in the United States, we cannot ensure that you will have a lawyer appointed for you before any questioning.

If you decide to speak with us now, without a lawyer present, you will still

---

7. His true name and national origin would not be known until an interrogation on August 22.

have the right to stop answering questions at any time.

You should also understand that if you decide not to speak with us, that fact cannot be used as evidence against you in a court in the United States.

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

10. S.A. Gaudin had no instructions on how to proceed in the event that Al-'Owhali requested the presence of an attorney.

11. Detective Parola asked Al-'Owhali (in English) whether he could read the AOR. Al-'Owhali indicated that he could not read English, but that he could understand spoken English to a limited degree.

12. Detective Parola read the AOR aloud in English, going slowly and checking for visual signs of comprehension. Al-'Owhali appeared to understand, replied that he understood when asked, and signed his alias at the bottom of the AOR in Arabic when requested to do so.

13. The FBI interpreter who was present at most of Al-'Owhali's interrogations in Kenya testified that, in his opinion, Al-'Owhali would likely have had difficulty understanding the AOR if it were only read to him aloud in English.

14. The CID officers did not advise Al-'Owhali of his rights under Kenyan law, nor did they ever do so during any other day of interrogation.

15. Al-'Owhali agreed to answer the Americans' questions and the session continued for roughly one hour. The interrogation was conducted entirely in broken English.

*Oral Translation of the AOR and Subsequent Interrogation*

16. Due to difficulties in communication, it was decided by the interrogators that an Arabic interpreter would be preferable. The parties have stipulated as to the sufficient qualifications of this interpreter, and that she had no trouble communicating with Al-'Owhali or vice versa.

17. Because the interpreter was afraid for her safety, she remained in the room hidden from Al-'Owhali at all times behind a blanket used as a makeshift curtain.

18. Present at this afternoon session on August 12, other than the interpreter, were S.A. Gaudin, Detective Parola, and the two CID officers.

19. S.A. Gaudin read aloud the same printed AOR while the translator concurrently translated what was being said into Arabic. Subsequently, Al-'Owhali indicated that he understood that the warning was the same one as from the morning session and that he understood his rights as described therein.

20. Al-'Owhali agreed to answer questions. This interview lasted about 3 hours.

*Continued Interrogation*

21. From the outset, Al-'Owhali was considered by his interrogators to be a suspect in the embassy bombing, a violation of both U.S. and Kenyan law. S.A. Gaudin understood that he was, at all times, involved in a criminal investigation.

22. Subsequent to August 12, interrogation of Al-'Owhali took place on eight other days: August 13 (approx. 4 hours), 14 (approx. 2 to 2.5 hours), 17 (approx. 3.5 hours), and 21–25.

23. During the interrogations between August 12 and 17, the primary Ameri-

cans involved were S.A. Gaudin and Detective Parola. Between August 21 and 25, the primary Americans involved were S.A. Gaudin and S.A. Bongardt. AUSA [redacted] took an active role beginning on August 22.

24. The Kenyan police rarely, if ever, posed questions of their own to Al-'Owhali.

25. The first interpreter was used only for interrogations between August 12–14. FBI Language Specialist ("L.S.") Mike Feghali provided translation services from August 17 onward. The Court found L.S. Feghali to be eminently qualified.

26. At the start of each interrogation on August 13, 14, 17, and 21, rather than re-apprise Al-'Owhali of his rights, the interrogators would simply show Al-'Owhali the written AOR he had signed on August 12 and inquire if he recalled the description of his rights contained therein. Asked if he would continue to answer questions, Al-'Owhali agreed.

### Identification Parade

27. At approximately 12:05 p.m. on August 20, the CID subjected Al-'Owhali to an identification parade. This procedure is similar to a police station lineup as conducted in the United States, the major differences being that in Kenya witnesses face the array in person and a greater number of stand-ins are used. A positive identification occurs when a witness touches the shoulder of an individual standing in the array.

28. Besides Al-'Owhali, there were 8 stand-ins used in the identification parade.

29. This proceeding was held at the direction of the Kenyans.

30. Six witnesses viewed the parade, but only one recognized Al-'Owhali.

31. The parade took place away from CID headquarters at the Kilamani Police Station of the Kenyan National Police. S.A. Gaudin and Detective Parola were both present; L.S. Feghali acted as the Arabic translator.

32. When informed that Kenyan law permitted a friend or solicitor to be present, Al-'Owhali requested a representative from the Yemeni embassy; for reasons unclear, the embassy declined to send a representative at that time.

### U.S. Missile Strikes

33. During the evening of August 20, it became known in Kenya that the United States had carried out missile strikes against locations in Afghanistan and Sudan which were believed to be associated with Usama Bin Laden. These strikes were in retaliation to the bombings of the U.S. embassies in Kenya and Tanzania.

34. In the ensuing days, some political figures in Kenya announced in public that none of the U.S. embassy bombing suspects should be tried in Kenya.

35. For reasons of safety, much of the American presence in Kenya was pared down to essential personnel. Detective Parola returned to the United States, while S.A. Gaudin, S.A. Bongardt, and AUSA [redacted] remained.

### Inculpatory Statements

36. From the moment of his arrest on August 12 until late into the August 21 interrogation, Al-'Owhali consistently denied involvement in the embassy bombing.

37. On August 21, S.A. Gaudin fingerprinted Al-'Owhali in his holding cell. S.A. Gaudin did so in the belief that he might shortly be leaving Kenya and thought it best to have such evidence in his file. This was the first time Al-'Owhali had been fingerprinted by either the Americans or Kenyans.

38. For purposes of the August 21 interrogation, S.A. Gaudin and S.A. Bongardt related to Al-'Owhali all the evidence they had thus far amassed against him.

39. After acknowledging that the agents "knew everything," Al-'Owhali said that he would tell the truth about his involvement in the bombing if he could be tried in the United States. Al-'Owhali stated that he wanted to be tried in the United States because the United States was his enemy, not Kenya.

40. Because the agents did not know how to respond to Al-'Owhali's demand for a guarantee that he would in fact be taken to the United States, the session ended without further questioning. No inculpatory statements were made.

41. On August 22, AUSA [redacted] joined in the interrogation of Al-'Owhali. Additionally present were S.A. Gaudin, S.A. Bongardt, and the two CID officers.

42. At the start of the meeting, AUSA [redacted] presented to Al-'Owhali the following document of understanding ("the DOU"), previously approved by AUSA [redacted]'s superiors at the U.S. Department of Justice:

I ... have been fully advised of my rights, including my right to remain silent and my right not to answer questions without a lawyer present. As I have been previously told, I understand that anything I say or have said can be used against me in court in the United States. I also understand that if I choose not to answer questions my refusal to answer questions cannot be held against me in court. I further understand that if I choose to answer questions, I can always change my mind and decide not to answer any further questions.

I understand that both Kenyan and American authorities are investigating the murder of the various American and Kenyan victims in and around the United States embassy in Nairobi.

I have a strong preference to have my case tried in an United States Court because America is my enemy and Kenya is not. I would like my past and present statements about what I have done and why I have done it to be aired in public in an American courtroom. I understand that the American authorities who are interviewing me want to know who committed the bombing of the embassy and how it was carried out.

I am willing to waive my rights and answer the questions of American authorities upon the condition that the undersigned law enforcement authorities make all best efforts to see that I am brought to the United States to stand trial. I understand that the undersigned prosecutor is only empowered to make recommendations to the Attorney General of the United States and other executive officials of the United States Government and I further understand that the United States Government only intends to act with the mutual agreement of the Kenyan government.

No other agreements or promises have been made other than as set forth in this document.

43. Before the DOU was read to Al-'Owhali, Al-'Owhali commented that he might wish to have an attorney review the DOU to make sure it was enforceable.

44. As a prudential measure, AUSA [redacted] immediately advised Al-'Owhali of his *Miranda* rights. This was recited entirely from AUSA [redacted]'s memory of a domestic *Miranda* warning. AUSA [redacted] made no reference to the AOR utilized on the first day of interrogation. This was all translated by L.S. Feghali.

45. AUSA [redacted] told Al-'Owhali that he had the right to remain silent;

that he had the right "to have an attorney present during this meeting;" that even if Al-'Owhali decided to talk he could always change his mind later; that Al-'Owhali's statements could be used against him in court, though the fact of his silence could not. AUSA [redacted] also said that he was an attorney for the U.S. government, not for Al-'Owhali. It was repeatedly stressed to Al-'Owhali that he was the "boss" at all times as to whether he wished to answer questions without a lawyer present.

46. AUSA [redacted] told Al-'Owhali that there was no American attorney currently available for him in Kenya.

47. Al-'Owhali indicated that he understood all of his rights.

48. AUSA [redacted] then read the agreement aloud to Al-'Owhali through L.S. Feghali. As to each and every paragraph, AUSA [redacted] asked Al-'Owhali if he understood what had just been explained to him; Al-'Owhali said yes. At no time did Al-'Owhali assert his rights.

49. By the time the penultimate paragraph of the DOU was read to him, Al-'Owhali expressed dissatisfaction with the uncertainty associated with just a "recommendation" that he be brought to the United States. As a result, AUSA [redacted] left the room to make further inquiries of his superiors. Before leaving, AUSA [redacted] asked twice if Al-'Owhali was comfortable proceeding without an attorney; Al-'Owhali said yes.

50. After more than two hours, Al-'Owhali indicated that he would be willing to talk even without a full guarantee because he trusted the U.S. officials to do the best they could to bring him to the United States.

51. AUSA [redacted] returned and asked if Al-'Owhali was comfortable proceeding without an attorney. Al-'Owhali said that he was and that he wished to sign the DOU.

52. The DOU was presented to Al-'Owhali. It was not re-read to him, though Al-'Owhali did sign it, but only after advising that the DOU would have to be revised in order to include his true name and nationality. The DOU was signed at 4:36 p.m. Kenyan time.

53. The interrogation on August 22 lasted from 1:10 p.m. to approximately 8:00 p.m.

54. During the next four days of interrogation, Al-'Owhali inculpated himself in the embassy bombing.

55. At the beginning of the sessions on August 23, 24, and 25, rather than re-read the DOU to Al-'Owhali, the interrogators simply showed him the document to ensure that he recalled its contents. Asked if he still wished to answer questions, Al-'Owhali assented.

56. The interviews on August 23 and 24 lasted for about 3 hours, while the August 25 session lasted about 9 hours.

*Immunity Deal*

57. Late into the August 25 interrogation, Al-'Owhali indicated that he possessed time-sensitive information regarding an issue of public safety, but would only reveal it if he was guaranteed that he would be tried in the United States and not Kenya. AUSA [redacted], with approval from Washington, created a second document of understanding ("the second DOU") for Al-'Owhali's signature:

I ... have been fully advised of my rights, including my right to remain silent and my right not to answer questions without a lawyer present. As I have been previously told, I understand that anything I say or have said can be used against me in court in the United States. I also understand that if I choose not to answer questions my re-

fusal to answer questions cannot be held against me in court. I further understand that if I choose to answer questions, I can always change my mind and decide not to answer any further questions.

I have answered a number of questions of the American authorities and have provided truthful information after initially providing incorrect information. However, I have also indicated that there is additional information that I have which I stated I would share with the United States authorities upon my arriving in America and obtaining an attorney. I have also indicated that the information concerns a public safety issue. Because I would otherwise not make this disclosure before arriving in the United States and speaking to an attorney, but because American authorities do not wish to take the risk that the delay concerning the information I intend to impart later will cause loss of life, it is hereby agreed that I will tell the United States authorities about this information prior to returning to America. In turn, the American authorities agree not to use the fact that I disclosed this particular information against me as evidence in the Government's case in chief if I should demand a trial of the charges that will be filed against me. I understand that the United States intends to pursue appropriate investigative leads based upon this information I am now agreeing to provide. I also understand that the United States is free to use any evidence gained in following up the investigative leads but will not advise any jury that hears my case of the fact that I revealed this particular information to the United States government, unless: (1) I testify falsely (or otherwise elicit false or misleading evidence or testimony) and revealing this fact will serve to correct false or misleading evidence; or (2) I request that the jury be advised of the fact that I disclosed this particular information and the Court overrules objection, if any, by

the Government. The Government hereby agrees that if the Defendant is convicted, the Government will disclose the fact that I provided this information to the judge or jury determining or imposing sentence if requested to do so by the defendant. There is no promise that providing such information will affect my sentence.

No other agreements or promises have been made other than as set forth in this document and the prior agreement dated August 22, 1998.

I have decided to sign this document because I have been advised by the undersigned that I am now scheduled to be removed to the United States within the next 24 hours, travel conditions permitting, and the undersigned is aware of no objections from either the United States or Kenya governments to such removal.

58. AUSA [redacted] read the second DOU to Al-'Owhali through L.S. Feghali, and Al-'Owhali signed. Al-'Owhali then proceeded to relate the subject information to his interrogators. At Al-'Owhali's request, this conversation took place without the Kenyan police.

59. On the morning of August 26, Al-'Owhali was transported from Kenya to the United States. Once aboard the aircraft, Al-'Owhali was advised of his conventional *Miranda* rights by S.A. Gaudin through L.S. Feghali. Al-'Owhali stated that he knew his rights, signed the advice of rights form, and invoked his right to appointed counsel.

60. He arrived in New York City at approximately 1:40 a.m. on August 27. He appeared before a federal magistrate judge in the Southern District of New York at about 10:00 a.m. that day.

*Conduct of the Interrogators*

61. Al-'Owhali was never in handcuffs during any of his interviews in Kenya.

62. All interviews were held in a library-like room fitted with tables and chairs.

63. Frequent breaks were taken to allow Al-'Owhali to use the restroom, pray, and eat. Prayer breaks lasted for about 15 minutes.

64. Bottled water was provided upon request; food was often provided by the agents.

65. No threats were made by the U.S. agents, nor were any promises made.

### Conditions of Confinement

66. Al-'Owhali was held by Kenyan authorities in incommunicado detention from August 12 until August 26—a total of fourteen nights. Kenyan law allows for 14 days of post-arrest detention for those suspected of a capital offense.

67. For the first two nights, he was held at the Jomo Kenyatta International Airport Police Station in Nairobi. The cell was 10–feet–by–11–feet, had a 2–feet–by–5–feet window, and had a concrete bed. Al-'Owhali shared this cell with another individual.

68. On the third night he was moved to an 8–feet–by–8–feet concrete holding cell within the basement of CID headquarters, where he remained until his rendition to the United States on August 26. In this cell, Al-'Owhali slept on some sort of thin mat and was provided with at least one blanket.

69. Medical attention was given to Al-'Owhali as needed.

### Characteristics of the Accused

70. At the time of the interrogations, Al-'Owhali had a basic understanding of spoken English. He would sometimes answer the simpler questions posed to him before the Arabic interpreter had even finished translating it.

71. To the U.S. officials who interrogated him, Al-'Owhali appeared to be an intelligent, well-read individual. Al-'Owhali has two years of university education and significant military experience.

72. During his interviews with American agents, he exhibited familiarity with a variety of political and world events.

### The Decision to Prosecute in the United States

73. The final decision that Al-'Owhali would be prosecuted in the United States was made on or about an August 25, 1998 telephone conversation between the U.S. Attorney for the Southern District of New York and the U.S. Attorney General.

## B. DEFENDANT K.K. MOHAMED

Because K.K. Mohamed moves to suppress statements purely on the basis of an allegedly deficient advice of rights administered by U.S. officials, our findings of fact are limited to that narrow issue. We base our findings on the various affidavits and documentary evidence submitted in connection with the motion.

### The Arrest

74. On or about August 1999, S.A. Gaudin was in Cape Town, South Africa in furtherance of his investigation into the East Africa embassy bombings.

75. Christo Terblanche, Chief Immigration Officer ("CIO") of the South African Department of Home Affairs ("SADHA"), met with S.A. Gaudin at SADHA's Cape Town headquarters on August 30, 1999. There, he afforded S.A. Gaudin access to a file relating to South African asylum seekers.

76. In that file, S.A. Gaudin found an asylum application bearing the photograph of an individual he recognized as K.K. Mohamed. The name used in the application, however, was not that of K.K. Mohamed. S.A. Gaudin im-

mediately informed CIO Terblanche of this discrepancy.

77. This lead to the arrest of K.K. Mohamed on October 5, 1999—the date when he, as an asylum applicant, was required to be at the Cape Town Customs Building in order to extend the temporary immigration permit that permitted him to stay in South Africa.

78. Present for the arrest were CIO Terblanche, another SADHA immigration officer, and S.A. Gaudin. S.A. Gaudin, however, took no part in the arrest.

79. CIO Terblanche identified himself to K.K. Mohamed and apprised him of his rights under South African law. K.K. Mohamed was told that he was under arrest, that he was under no duty to say anything, that anything he said might be used in evidence against him, and that he was entitled to legal representation if he so wished.

80. Thereafter, K.K. Mohamed was taken to a SADHA holding facility at Cape Town International Airport.

### South African Interrogation

81. K.K. Mohamed was first interrogated by CIO Terblanche and Immigration Officer Gideon Christians. Nobody else was present. The topic of this interview concerned only K.K. Mohamed's immigration status in South Africa.

82. Before any questioning began, Officer Christians again told K.K. Mohamed that he was entitled to a legal representative if he so wished.

### Interrogation by U.S. Law Enforcement

83. After the South African officers finished, FBI agents were allowed to speak with K.K. Mohamed. They did so on October 5 and 6.

84. Two FBI agents conducted these interrogations. Nobody else was present.

85. Immediately upon meeting K.K. Mohamed on October 5, the agents asked of his language abilities. K.K. Mohamed indicated that his English was sufficient to communicate; Swahili is his native language.

86. The agents presented K.K. Mohamed with English and Swahili versions of the following AOR:

We are representatives of the United States Government. Under our laws, you have certain rights. Before we ask you any questions, we want to be sure that you understand those rights.

You do not have to speak to us or answer any questions. Even if you have already spoken to the South African authorities, you do not have to speak to us now.

If you do speak with us, anything that you say may be used against you in a court in the United States or elsewhere.

In the United States, you would have the right to talk to a lawyer to get advice before we ask you any questions and you could have a lawyer with you during questioning. In the United States, if you could not afford a lawyer, one would be appointed for you, if you wish, before any questioning.

Because we are not in the United States, we cannot ensure that you will have a lawyer appointed for you before any questioning.

If you decide to speak with us now, without a lawyer present, you will still have the right to stop answering questions at any time.

You should also understand that if you decide not to speak with us, that fact cannot be used as evidence against you in a court in the United States.

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a

lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

87. In all relevant respects, this was the same AOR that was used during U.S. questioning of Al-'Owhali in Kenya.

88. After being read the English form and then reading the Swahili form on his own, K.K. Mohamed indicated that he understood his rights and that he was willing to speak with the agents. K.K. Mohamed signed both forms.

### III. MOTIONS TO SUPPRESS CUSTODIAL STATEMENTS: FIFTH AMENDMENT

#### A. LEGAL STANDARD

Our analysis of Defendants' motions to suppress statements turns chiefly on the constitutional standard we adopt today, as a matter of first impression, concerning the admissibility of a defendant's admissions at his criminal trial in the United States, where that defendant is a non-resident alien and his statements were the product of an interrogation conducted abroad by U.S. law enforcement representatives. We conclude that such a defendant, insofar as he is the present subject of a domestic criminal proceeding, is indeed protected by the privilege against self-incrimination guaranteed by the Fifth Amendment, notwithstanding the fact that his only connections to the United States are his alleged violations of U.S. law and his subsequent U.S. prosecution. Additionally, we hold that courts may and should apply the familiar warning/waiver framework set forth in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), to determine whether the government, in its case-in-chief, may introduce against such a defendant evidence of his custodial statements—even if

that defendant's interrogation by U.S. agents occurred wholly abroad and while he was in the physical custody of foreign authorities.

1. *The Privilege Against Self–Incrimination and Non–Resident, Unconnected Aliens*

■ The predicate issue is as follows: Is the Government correct that a criminal defendant on trial in the United States does not enjoy the privilege against self-incrimination because he is a non-resident alien whose only connections to the United States are his alleged violations of U.S. law and his subsequent U.S. prosecution? [8] We regard this narrow reading of the Constitution as being at odds with the text of the Fifth Amendment, overarching notions of fundamental fairness, relevant caselaw, and the policy goals supporting the privilege against self-incrimination. Therefore, we reject the Government's interpretive contention and find that defendants in the position of Al-'Owhali and K.K. Mohamed may properly invoke the privilege against self-incrimination as a basis for suppressing custodial statements made to U.S. law enforcement representatives during overseas interrogation. (*Cf. United States v. Yunis*, 859 F.2d 953, 970–971 (D.C.Cir. 1988) (Mikva, J., concurring specially) (reaching same conclusion).)

■ To begin, it bears noting that the Government incorrectly frames the legal inquiry as one dependent on the extraterritorial application of the Fifth Amendment. Whether or not Fifth Amendment rights reach out to protect individuals while they are situated outside the United States is beside the point. This is because any violation of the privilege against self-incrimination occurs, not at the moment law enforcement officials coerce statements through custodial interrogation, but when a defendant's involuntary statements are actually used against him at an Ameri-

---

**8.** Originally, the Government conceded the application of the Fifth Amendment. It later retreated from this position 1 day prior to the first Al-'Owhali suppression hearing. (Gov't Dec. 11, 2000 Ltr. to the Court)

can criminal proceeding.[9] (*See United States v. Verdugo–Urquidez*, 494 U.S. 259, 264, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) ("Although conduct by law enforcement officials prior to trial may ultimately impair [the privilege against self-incrimination], a constitutional violation occurs only at trial.") (citing *Kastigar v. United States*, 406 U.S. 441, 453, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972)); *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d Cir.1998) ("Even if it can be shown that a statement was obtained by coercion, there can be no Fifth Amendment violation until that statement is introduced against the defendant in a criminal proceeding.").) Indeed, were the opposite the case—that is, if instead the Fifth Amendment injury resulted from the forcible extraction of a statement and not its later evidentiary use—then no statute compelling witness testimony under grants of immunity could withstand constitutional challenge. (*See Mahoney v. Kesery*, 976 F.2d 1054, 1061–62 (7th Cir.1992); *see also Kastigar*, 406 U.S. at 453, 92 S.Ct. 1653 (upholding federal witness immunity statute on grounds that, by barring prosecutor from use and derivative use of witness's compelled testimony, statute satisfies "sole concern" of privilege against self-incrimination, i.e., "insur[ing] that the testimony cannot lead to the infliction of criminal penalties on the witness").) The violation of Defendants' rights here, if any, is clearly prospective, and so the relevant question is the scope of the privilege against self-incrimination as to non-resident aliens presently inside the United States and subject to domestic criminal proceedings.[10]

9. Limited support for this reasoning can further be found in cases where courts have addressed efforts by defendants to suppress statements resulting from overseas interrogation *by foreign police*. These decisions refuse to suppress statements on the sole ground that foreign police failed to administer pre-interrogational *Miranda* warnings; the deterrent rationale of the exclusionary rule, it is posited, has little force with respect to a foreign sovereign. (*See, e.g., United States v. Welch*, 455 F.2d 211, 213 (2d Cir.1972); *Kilday v. United States*, 481 F.2d 655, 656 (5th Cir.1973).) However, the same courts then go on to determine whether the challenged statement is nonetheless involuntary and should thus be suppressed pursuant to the privilege against self-incrimination. (*See, e.g., Welch*, 455 F.2d at 213 (citing *Bram v. United States*, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897) (privilege against self-incrimination case)); *Kilday*, 481 F.2d at 656 (citing same).) This added layer of review assumes implicitly what we state explicitly above: that the extraterritorial situs of interrogation is not dispositive since the Constitution is violated when a defendant's compelled statement is used against him as evidence, and not when he is coerced into making it in the first place. (*See Brulay v. United States*, 383 F.2d 345, 349 n. 5 (9th Cir.) ("[W]e believe that if the statement is not voluntarily given, whether given to a United States or foreign officer, the defendant has been compelled to be a witness against himself when the statement is admitted."), *cert. denied*, 389 U.S. 986, 88 S.Ct. 469, 19 L.Ed.2d 478 (1967). *But see United States v. Wolf*, 813 F.2d 970, 973 n. 3 (9th Cir.1987) (suggesting, but not deciding, that the effect of *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), might be that Fifth Amendment suppression is not required when confession obtained by foreign as opposed to American police).)

10. It is for this reason that the Government's heavy reliance on *United States v. Verdugo–Urquidez*, 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990), *Johnson v. Eisentrager*, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950), and *Harbury v. Deutch*, 233 F.3d 596 (D.C.Cir.2000), is fundamentally misplaced. In all three cases, the putative constitutional injury occurred entirely abroad, thereby necessarily raising the issue of a specific Amendment's extraterritorial effect. (*See Verdugo–Urquidez*, 494 U.S. at 264, 110 S.Ct. 1056 (search and seizure in Mexico); *Eisentrager*, 339 U.S. at 766, 70 S.Ct. 936 (prosecution and conviction in China; imprisonment in Germany); *Harbury*, 233 F.3d at 603 (torture in Guatemala).)

Moreover, at issue in *Eisentrager* was a specific kind of non-resident alien—"the subject of a foreign state at war with the United States." (339 U.S. at 769 n. 2, 70 S.Ct. 936.) And though the trial and conviction in China of the *Eisentrager* aliens was "conducted wholly under American auspices and involved no international participation," the proceeding was operated pursuant to a temporary military commission specially constituted under the authority of the Joint Chiefs of Staff. (*Id.* at 766, 70 S.Ct. 936.) It did not involve a domestic Article III court, as is the circumstance with respect to the instant Defendants.

We turn first to the expansive language used in the Fifth Amendment itself. Its criminal procedure provisions are that:

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law

. . . .

(U.S. Const.amend.V.) The crucial phrase is "no person" and it neither denotes nor connotes any limitation in scope, in marked contrast to the use of "the people" in most of the other Amendments contained within the Bill of Rights. (*Compare id.* with U.S. Const. amends. I, II, IV, IX, & X. *See also Verdugo,* 494 U.S. at 264–266, 110 S.Ct. 1056; *Wang v. Reno,* 81 F.3d 808, 817 (9th Cir.1996).) From the outset, then, these protections seemingly apply with equal vigor to all defendants facing criminal prosecution at the hands of the United States, and without apparent regard to citizenship or community connection.

In the face of the Amendment's inclusive text, however, the Government insists that "any assessment of the · extent to which constitutional rights may vest in a non-American in a given instance is significantly influenced by the degree to which he has sought to insert himself into the fabric of our society." (Gov't Dec. 11, 2000 Ltr. to the Court at 2.) Whatever the validity of this proposition in unrelated contexts (e.g., immigration), it is unsupportable in its intimation that criminal defendants on trial in a U.S. court should receive differing levels of Fifth Amendment procedural protection depending on their level of "insertion" into American society. Indeed, as the Government itself admits (*id.* at 3), the U.S. Supreme Court has already found at least one right contained in the Fifth Amendment to be free from such constriction. (*See Mathews v. Diaz,* 426 U.S. 67, 77, 96 S.Ct. 1883, 48 L.Ed.2d 478) (1976)) ("There are literally millions of aliens within the jurisdiction of the United States. The Fifth Amendment, as well as the Fourteenth Amendment, protects every one of these persons from deprivation of life, liberty, or property without due process of law. Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection.") (citations omitted); *see also Verdugo–Urquidez,* 494 U.S. at 278, 110 S.Ct. 1056 (Kennedy, J., concurring) (commenting that, "[a]ll would agree . . . that the dictates of the Due Process Clause of the Fifth Amendment protect the defendant," where the prosecuted defendant was in fact an unconnected, non-resident alien); *Jean v. Nelson,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985) ("The right of an unadmitted alien to Fifth Amendment due process protections at trial is universally respected by the lower federal courts . . . .").)

It is true that the Supreme Court has yet to rule affirmatively that the three remaining Fifth Amendment procedural guarantees—indictment by grand jury, bar on double jeopardy, and privilege against self-incrimination—apply to criminal defendants who are non-citizens. But we find that circumstance to be emblematic, not of doctrinal reticence, but of widespread acceptance that these strictures apply universally to any criminal prosecution brought by the United States within its own borders. (*See, e.g., Verdugo–Urquidez,* 494 U.S. at 278, 110 S.Ct. 1056 (Kennedy, J., concurring) ("I do not mean to imply, and the Court has not decided, that persons in the position of respondent [i.e., unconnected, non-resident aliens] have no constitutional protection. The United States is prosecuting a foreign national in a court established under Article III, and all of the trial proceedings are governed by the Constitution."); *Jean,* 472 U.S. 846,

105 S.Ct. at 3006–07 ("[W]hen an [excludable] alien detained at the border is criminally prosecuted in this country, he must enjoy at trial all of the protections that the Constitution provides to criminal defendants.").) And even in the context of this particular case, we note that the parties have proceeded as if Defendants indeed possessed these three rights: The Government has sought a grand jury indictment nine times; the Court has reviewed the charging instrument for multiplicitous counts; and the desire by some defendants not to testify at various hearings, whenever so expressed, has been scrupulously honored. In sum, we are not at all surprised that courts rarely, if ever, face the scenario wherein the United States, acting domestically, attempts to convict non-resident aliens without following the procedural framework of the Fifth Amendment.[11]

Of great significance is the Supreme Court's own explicit treatment of the privilege against self-incrimination as a "fundamental trial right of criminal defendants." (*Verdugo–Urquidez*, 494 U.S. at 264, 110 S.Ct. 1056 (citing *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964)).) In doing so, that Court has heretofore heralded the constitutionalization of the right as "register[ing] an important

advance in the development of our liberty—'one of the great landmarks in man's struggle to make himself civilized.' " (*Ullmann v. United States*, 350 U.S. 422, 426, 76 S.Ct. 497, 100 L.Ed. 511 (1956) (citing Griswold, *The Fifth Amendment Today* (1955) at 7); *see also Withrow v. Williams*, 507 U.S. 680, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993) ("The privilege embodies 'principles of humanity and civil liberty, which had been secured in the mother country only after years of struggle ....' ") (quoting *Bram v. United States*, 168 U.S. 532, 544, 18 S.Ct. 183, 42 L.Ed. 568 (1897)).) Consider too this untrammeled praise:

> "[A]ny compulsory discovery by extorting the party's oath ... to convict him of crime ... is contrary to the principles of a free government. It is abhorrent to the instincts of an Englishman; it is abhorrent to the instincts of an American. It may suit the purposes of despotic power, but it cannot abide the pure atmosphere of political liberty and personal freedom."

(*Malloy*, 378 U.S. 1, at 9 n. 7, 84 S.Ct. 1489 (quoting *Boyd v. United States*, 116 U.S. 616, 631–632, 6 S.Ct. 524, 29 L.Ed. 746 (1886)).) It is quite understandable why the Supreme Court has urged, and we

---

**11.** One such rare instance came before the Supreme Court in *Wong Wing v. United States*, 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1896). The 1892 Chinese Exclusion Act provided that any person of Chinese descent found, by means of a summary proceeding, to be illegally present in the United States "shall be imprisoned at hard labor for a period not exceeding one year" prior to his deportation "to the country whence he came." (*Id.* at 230, 234, 16 S.Ct. 977.) While finding no problem with the exclusion, detention, and deportation provisions of the Act, the Court overruled its punitive element. It found the prescribed punishment criminal and "infamous," and thus one that could only be imposed in accordance with the Fifth and Sixth Amendments. (*Id.* at 237, 16 S.Ct. 977 ("But when Congress sees fit to further promote [its immigration] policy by subjecting the persons of such aliens to infamous punishment at hard labor, or by confiscating their property, we think such legislation, to be valid, must provide for a judicial trial to establish the

guilt of the accused."); *see also id.* at 238, 16 S.Ct. 977 ("[I]t must be concluded that all persons within the territory of the United States are entitled to the protection guaranteed by [the Fifth and Sixth Amendments]."); *id.* at 242, 16 S.Ct. 977 (Field, J., concurring in part and dissenting in part) ("The term 'person' used in the Fifth Amendment, is broad enough to include any and every human being within the jurisdiction of the republic.").) As for petitioners' citizenship status, the opinion reveals only that they were Chinese subjects and that they were arrested in Detroit for being "unlawfully within the United States." (*Id.* at 239, 16 S.Ct. 977 (Field, J., concurring in part and dissenting in part).) Nothing, however, is reported as to how long they had actually been inside America. (*But see Verdugo–Urquidez*, 494 U.S. at 271, 110 S.Ct. 1056 (inexplicably reading *Wong Wing* as pertaining only to "resident aliens," when the very aliens in that case were about to be expelled for being *without* legal U.S. residency).)

wholeheartedly agree, that "[t]his constitutional protection must not be interpreted in a hostile or niggardly spirit." (*Ullmann*, 350 U.S. at 426, 76 S.Ct. 497.)

Lastly, we believe that the policies undergirding the Fifth Amendment privilege against self-incrimination are no less relevant when the criminal defendant at issue is an unconnected, non-resident alien. Those "fundamental" and "noble" goals, as described by Justice Goldberg, are:

> [O]ur unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load; our respect for the inviolability of the human personality and of the right of each individual to a private enclave where he may lead a private life; our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes a shelter to the guilty, is often a protection to the innocent.

(*U.S. v. Balsys*, 524 U.S. 666, 690, 118 S.Ct. 2218, 141 L.Ed.2d 575 (1998) (quoting *Murphy v. Waterfront Comm'n of N.Y. Harbor*, 378 U.S. 52, 55, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964)).) While these policies may arguably lose their force when the fear of compelled self-incrimination points to a prospective foreign prosecution (*see id.* at 690–691, 118 S.Ct. 2218), when the defendant is, as here, prosecuted within the United States, before a United States court, for alleged violations of United States law, having been previously and thoroughly interrogated by U.S. law enforcement—then the Government's use of a coerced confession against him would

still have the debilitating effect of infecting our criminal justice system. Such a system will undoubtedly, "in the long run, be less reliable and more subject to abuses." (*Withrow*, 507 U.S. at 692, 113 S.Ct. 1745; *see also Miranda*, 384 U.S. at 460, 86 S.Ct. 1602 ("[O]ur accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth.").)

We hold that Defendants Al-'Owhali and K.K. Mohamed, as the present subjects of a U.S. criminal proceeding, are protected by the Fifth Amendment's privilege against self-incrimination, despite their status as non-resident aliens whose only connections to this country are their alleged crimes and their domestic prosecution therefor.

2. *Applying Miranda to the Overseas Interrogation by U.S. Law Enforcement of a Suspect in Foreign Custody*

■ Our next inquiry focuses on an issue imbued with significant consequence, not the least of which is its inevitable impact on U.S. law enforcement officials who, in furtherance of their duties and with increasing regularity, are dispatched and stationed beyond our national borders. Assume for purposes of this discussion these generalized facts: An individual held in the custody of foreign police is suspected of having violated both local and U.S. criminal law. As a matter of global comity, U.S. law enforcement representatives are permitted inside the foreign stationhouse to pose their own questions to the suspect. U.S. agents eventually succeed in extracting inculpatory statements, and the suspect is thereafter transported to the United States for prosecution, with the consent of foreign authorities. By what standards should a domestic court admit the above statements as governmental evidence at trial? We believe that a princi-

pled, but realistic application of *Miranda's* familiar warning/waiver framework, in the absence of a constitutionally-adequate alternative, is both necessary and appropriate under the Fifth Amendment. Only by doing so can courts meaningfully safeguard from governmental incursion the privilege against self-incrimination afforded to all criminal defendants in this country—wherever in the world they might initially be apprehended—while at the same time imposing manageable costs on the transnational investigatory capabilities of America's law enforcement personnel.

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court found custodial interrogation to be presumptively coercive. It mattered not that this police practice, in its modern American guise, is "psychologically rather than physically oriented." (*Id.* at 448, 86 S.Ct. 1602.) Indeed, the technique's core characteristics—above all, "to thrust [the suspect] into an unfamiliar atmosphere and run [him] through menacing ... procedures—made it "obvious" to the Court "that such an interrogation environment is created for no purpose other than to subjugate the individual to the will of his examiner." (*Id.* at 457, 86 S.Ct. 1602.) The Court thus concluded that "[u]nless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice." (*Id.* at 458, 86 S.Ct. 1602.) And so, for an accused's own words to be used against him at trial, the prosecutor must first show that those admissions were preceded by an advice of rights to the accused, followed by a valid waiver of those rights. If, on the other hand, law enforcement failed to observe the *Miranda* safeguards, then the statement must be suppressed, thereby securing a defendant's privilege against self-incrimination from government intrusion,

as well as deterring future police misconduct. This tenet, rooted squarely in the Constitution, "has become embedded in routine police practice to the point where the warnings have become part of our national culture." (*Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326, 2336, 147 L.Ed.2d 405 (2000).)

Contrary to the Government's apocalyptic protestations, we are not dissuaded from applying *Miranda* to overseas interrogations conducted by U.S. law enforcement, even if the interrogational target is in the physical custody of foreign authorities. After all, the inherent coerciveness of that police technique is clearly no less troubling when carried out beyond our borders and under the aegis of a foreign stationhouse. It is, on the contrary, far more likely that a custodial interrogation held in such conditions will present greater threats of compulsion since all that happens to the accused cannot be controlled by the Americans. For instance, the laws of the host nation might permit lengthy incommunicado detention subsequent to arrest, thereby leaving the accused isolated and without assistance for a duration not seen today in America. Substandard detention conditions could further contribute to the toll. Worst yet, local authorities may privately engage in aggressive practices, both legal and illegal in their own nation, but certainly not tolerated within the United States. As such, by the time U.S. agents are finally on hand to ask questions of their own, strong countervailing forces will already have run head first into the free will of the accused.[12]

None of this is to say that American law enforcement representatives, who have behaved conscientiously and with great sensitivity, should always be responsible for the acts of a foreign sovereign. Rather, our point is—as is that of the Supreme Court in *Miranda*—that the inherent coercion

---

12. The interplay between foreign custody and U.S. interrogation may render some suspects vulnerable in a separate sense: They may be unduly predisposed to talking to U.S. agents

in the hope that doing so provides a means of relocation to the United States, where criminal defendants enjoy greater protection from governmental overreaching.

associated with any custodial interrogation is a specter that haunts all confessions later gleaned therefrom, even apart from the added externalities of oppressive detention and improper police behavior. (*See id.* at 455–456, 86 S.Ct. 1602.) The great wisdom of *Miranda*—that American law enforcement must do what it can at the start of interrogation to dissipate the taint of compulsion—is equally prescient, if not more so, when U.S. agents are conducting custodial interrogations in foreign lands, where certain factors impinging on voluntariness will simply be out of their control. For purposes of safeguarding the Fifth Amendment privilege against self-incrimination, the *Miranda* warning/waiver framework still provides, even in the overseas context, a necessary and workable solution. We therefore hold that a defendant's statements, if extracted by U.S. agents acting abroad, should be admitted as evidence at trial only if the Government demonstrates that the defendant was first advised of his rights and that he validly waived those rights. Suppression in the absence of either requirement will protect that defendant insofar as he is the present subject of a domestic criminal proceeding, while additionally deterring U.S. law enforcement from again committing similar omissions.[13] (*See Dickerson,* 530 U.S. 428, 120 S.Ct. at 2336 (rejecting case-by-case inquiry into voluntariness in favor of constitutionally-based *Miranda* warning/waiver framework).)

Our conclusion in this regard is further reinforced by the line of cases involving the suppression of statements elicited during overseas interrogation *by foreign police.* These decisions uniformly recognize an exception to the usual rule that the failure to provide *Miranda* warnings is not dispositive of the motion to suppress when-

ever questioning is conducted by foreign authorities. Referred to as the "joint venture" exception, it provides that the lack of *Miranda* warnings will still lead to suppression if U.S. law enforcement themselves actively participated in the questioning (*see United States v. Heller,* 625 F.2d 594, 599 (5th Cir.1980); *Pfeifer v. United States Bureau of Prisons,* 615 F.2d 873, 877 (9th Cir.), *cert. denied,* 447 U.S. 908, 100 S.Ct. 2993, 64 L.Ed.2d 858 (1980); *United States v. Emery,* 591 F.2d 1266, 1268 (9th Cir.1978); *United States v. Hensel,* 509 F.Supp. 1364, 1375 (D.Me.1981)), or if U.S. personnel, despite asking no questions directly, used the foreign officials as their interrogational agents in order to circumvent the requirements of *Miranda* (*see United States v. Bagaric,* 706 F.2d 42, 69 (2d Cir.), *cert. denied,* 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983), abrogated on other grounds, *National Org. for Women, Inc. v. Scheidler,* 510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994); *Welch,* 455 F.2d at 213; *Heller,* 625 F.2d at 599; *Hensel,* 509 F.Supp. at 1375; *United States v. Molina–Chacon,* 627 F.Supp. 1253, 1262 (E.D.N.Y.1986), *aff'd sub nom, United States v. DiTommaso,* 817 F.2d 201 (2d Cir.1987)). Whatever the precise formulation, the existence of the exception itself is based on the assumption that *Miranda* must apply to any portion of an overseas interrogation that is, in fact or form, conducted by U.S. law enforcement. This is perfectly consistent with our holding today.

█ It now remains to be decided what specific warnings should be administered by U.S. agents prior to their overseas interrogation of a suspect not in U.S. custody. Clearly, he must be told that he has the right to remain silent, effective even if he has already spoken to the foreign au-

---

**13.** The Government calls it "positively perverse" that the admissibility of Defendants' statements would not require any *Miranda* warnings at all if those statements were instead the product of questioning by foreign police. (Gov't Post–Hr'g Memo. in Opp. to Al-'Owhali's and Odeh's Mots. at 48–49.) Yet we see nothing at all anomalous in requiring *our own* Government to abide by the strictures of *our own* Constitution whenever it seeks to convict an accused, in *our own* courts, on the basis of admissions culled via an inherently coercive interrogation conducted by *our own* law enforcement.

thorities. He must also be told that anything he does say may be used against him in a court in the United States or elsewhere. This much is uncontroversial. But what about the right to the assistance and presence of counsel, either privately retained or publicly appointed? Unlike the previous two admonitions, this one may often be affected by the fact that the suspect is being interrogated overseas and that he is in the physical custody of a foreign nation. We agree with the Government that *Miranda* does not require law enforcement to promise that which they cannot guarantee or that which is in fact impossible to fulfill. No constitutional purpose is served by compelling law enforcement personnel to lie or mislead subjects of interrogation. Nor does *Miranda* mandate that U.S. agents compel a foreign sovereign to accept blind allegiance to American criminal ·procedure, at least when U.S. involvement in the foreign investigation is limited to mutual cooperation. However, if the particular overseas context actually presents *no* obvious hurdle to the implementation of an accused's right to the assistance and presence of counsel,[14] due care should be taken not to foreclose an opportunity that in fact exists.[15] To the maximum extent reasonably possible, efforts must be made to replicate what rights would be present if the interrogation were being conducted in America.

We thus believe that the fair and correct approach under *Miranda* is for U.S. law enforcement simply to be clear and candid as to both the existence of the right to counsel and the possible impediments to its exercise.[16] The goal is to convey to a suspect that, with respect to any questioning by U.S. agents, his ability to exercise his right to the presence and assistance of counsel—a right ordinarily unqualified—hinges on two external considerations arising from the fact of his foreign custody. First, since there exists no institutional mechanism for the international provision of an American court-appointed lawyer, the availability of public counsel overseas turns chiefly on foreign law.[17] Second, foreign law may also ban all manner of defense counsel from even entering the foreign stationhouse, and such law necessarily trumps American procedure.[18] Giv-

---

**14.** In other words, if foreign law itself provides appointed counsel to the indigent or permits access to counsel prior to and during interrogation.

**15.** This is so because the intervention of counsel will almost always provide some sort of benefit to a target of interrogation, a point conceded by the Government. (Gov't Memo. in Support of Reconsideration at 16.) Here, since there existed both the threat of foreign and U.S. prosecution, either an American or foreign lawyer, if desired, might have been helpful to Defendants.

**16.** Perhaps in the following manner:

Under U.S. law, you have the right to talk to a lawyer to get advice before we ask you any questions and you can have a lawyer with you during questioning. Were we in the United States, if you could not afford a lawyer, one would be appointed for you, if you wished, before any questioning.

Because you are not in our custody and we are not in the United States, we cannot ensure that you will be permitted access to a lawyer, or have one appointed for you, before or during any questioning.

However, if you want a lawyer, we will ask the foreign authorities to permit access to a lawyer or to appoint one for you. If the foreign authorities agree, then you can talk to that lawyer to get advice before we ask you any questions and you can have that lawyer with you during questioning.

If you want a lawyer, but the foreign authorities do not permit access at this time to a lawyer or will not now appoint one for you, then you still have the right not to speak to us at any time without a lawyer present.

**17.** To the extent that it is asserted that the Government presently possesses the resources to dispatch an American legal aid attorney, on an ad hoc basis, wherever and whenever a need for one arises, we find such reasoning unpersuasive. *Miranda* does not require such extraordinary effort by the Government. Nor may one ignore the significant delays which such a procedure might cause in a situation where timing may be critical.

**18.** We leave open whether this assumption remains valid if foreign authorities cede to U.S. law enforcement primary control of the

en these eventualities, U.S. law enforcement can only do the best they can to give full effect to a suspect's right to the presence and assistance of counsel, while still respecting the ultimate authority of the foreign sovereign. And if an attorney, whether appointed or retained, is truly and absolutely unavailable, and that result remains unsatisfactory to the suspect, he should be told that he need not speak to the Americans so long as he is without legal representation. Moreover, even if the suspect opts to speak without a lawyer present, he should know that he still has the right to stop answering questions at any time.

The foregoing reading of *Miranda* renders baseless the Government's claims that a warning/waiver requirement will impose intolerable costs to both international investigatory cooperation and America's own ability to deter transnational crime. As described above, if foreign law indeed bans all counsel from the stationhouse entirely, then we do not require U.S. law enforcement to violate such laws. Rather, only if the foreign authorities themselves permit the assistance and presence of counsel will that right be given effect during interrogation by U.S. agents. Even less persuasive is the alleged inability of the United States to counter transnational crime when constrained by *Miranda* overseas. We doubt that the simple recitation of an advice of rights to a criminal suspect questioned abroad, when such warnings are already required domestically, will in any way shift the tide in favor of global lawlessness. To the extent that a suspect's *Miranda* rights

allegedly impede foreign intelligence collection, we note that *Miranda* only prevents an unwarned or involuntary statement from being used as evidence in a domestic criminal trial; it does not mean that such statements are never to be elicited in the first place.[19]

In sum, we hold that statements obtained during overseas interrogation by U.S. law enforcement must meet the warning/waiver requirements of *Miranda* before they will be admitted into the Government's case-in-chief at trial. That the defendant at the time of interrogation was in the physical custody of foreign authorities matters only insofar as the specific admonitions recited should conform to the local circumstances regarding access to counsel, both retained and appointed, while inside the foreign stationhouse.

## B. ANALYSIS

### 1. The Overseas FBI Advice of Rights Form

■ U.S. law enforcement utilized the exact same AOR during the overseas interrogation of both Defendants whose motions to suppress are presently before the Court. In this subsection of the Opinion, we discuss only the facial sufficiency of the AOR as written. But because this AOR was also used in the interrogations of other defendants in the instant prosecution, and is apparently still being used by American law enforcement in its other international operations, the wider significance of our holding is heightened. We find, at least on the facts of this case, that

---

foreign-based investigation—facts not present in the instant case. The relationship in such a hypothetical scenario will have shifted from mutual cooperation to one of agency.

19. Indeed, with respect to Al-'Owhali, the Government took deft advantage of this very distinction. In exchange for Al-'Owhali's immediate revelation in Kenya of so-called "blue chip" information related to public safety, the Government agreed to provide Al-'Owhali with prosecutorial immunity as to the subject matter of that information.

It bears reiteration that the issues addressed by this Opinion relate solely to the admissibility of statements in an American court. This is *not* the same question as the ability of American law enforcement or intelligence officials to obtain intelligence formation from non-citizens abroad, information which may be vital to national security interests. What we find impermissible is not intelligence gathering by agents of the U.S. government empowered to do so, but rather the use in a domestic criminal trial of statements extracted in violation of the Fifth Amendment.

the AOR is facially deficient in its failure to apprise Defendants accurately and fully of their right, under *Miranda,* to the assistance and presence of counsel if questioned by U.S. agents, even considering the fact that Defendants were in the custody of foreign authorities.

Through the AOR, a suspect interrogated overseas by U.S. officials is initially told the following with respect to counsel:

> In the United States, you would have the right to talk to a lawyer to get advice before we ask you any questions and you could have a lawyer with you during questioning. In the United States, if you could not afford a lawyer, one would be appointed for you, if you wish, before any questioning.

Since the suspect is obviously aware that he is not now "in the United States," the logical conclusion for him to draw is that neither of the two previously enumerated rights are currently available to him. The clear, overriding message is that the right to counsel is instead geographically based. Appropriately enough, this reading is confirmed by the very next sentence:

> Because we are not in the United States, we cannot ensure that you will have a lawyer appointed for you before any questioning.

Nothing else in the AOR addresses a suspect's right to the assistance and presence of counsel for purposes of custodial interrogation by U.S. personnel.[20] Yet, standing alone, the three sentences above wrongly convey to a suspect that, due to his custodial situs outside the United States, he currently possesses no opportunity to avail himself of the services of an attorney before or during questioning by U.S. officials. The AOR, as is, prematurely forecloses the significant possibility that the foreign authorities themselves may, if asked, either supply counsel at public expense or permit retained counsel inside the stationhouse. Crucially, according to the provisions of foreign law received into evidence before the Court, at least one or both of these possibilities existed at the time of Defendants' respective interrogations in South Africa and Kenya.

In regard to South Africa, its Constitution guarantees that a suspect under interrogation has "the right to consult with an attorney of [his] choice and where [his] ability to procure the services of an attorney will lead to an injustice, the state will provide [him] with the services of an attorney." (Gov't Opp. to K.K. Mohamed's Mot. Ex. C.) The Court's understanding of the law as to Kenya, however, is murky at best. Kenya's Constitution imparts: "Every person who is charged with a criminal offense shall be permitted to defend himself before the court in person or by a legal representative of his own choice." (Kenya Const. § 77(2)(d).) Moreover, "nothing contained in [the aforementioned provision] shall be construed as entitling a person to legal representation at public expense." (*Id.* § 77(2)(14).) Yet the Kenyan Criminal Procedure Code guarantees that "[a] person accused of an offense before a criminal court, or against whom proceedings are instituted under this Code in a criminal court, may of right be defended by an advocate." (Kenya Crim. P.Code ch. 75, § 193.) And the Kenya Police Force Standing Orders also ensure: "Every person detained by police should be given facilities for communicating with a friend or legal adviser, and such person should be permitted to visit the prisoner." (Kenya Police Force Standing Orders ch. 49, § 15(i).) We deem it highly inadvisable for the Court to interpret, in the first instance, how these various provisions play

---

**20.** The AOR does inform the suspect: "If you decide to speak with us now, without a lawyer present, you will still have the right to stop answering questions at any time." Also, the waiver statement in the AOR declares: "I do not want a lawyer at this time." Neither sentence, however, adds to a suspect's substantive awareness of the nature of his right to counsel during overseas interrogation by U.S. law enforcement. These sentences instead derive their significance contextually, i.e., only when read against what the rest of the AOR says, or does not say, concerning the right to counsel.

out in practice within Kenya. That exercise, however, is fortunately unnecessary since we see nothing in the Government's submissions that leads us to believe that, in Kenya, a suspect under interrogation is *always* banned from seeking the advice and presence of *retained* counsel. Indeed, the Government's own representation has been that "any participation by [retained] counsel in the interview process is at the sole discretion of the investigators." ( [redacted] Jan. 16, 2001 Aff. ¶ 5.)

Quite apart from what South African and Kenyan law afford as to the assistance and presence of counsel during interrogation, we note that the record leaves open the possibility that, if given the chance, both K.K. Mohamed and Al-'Owhali may have been able to retain counsel on their own.[21] K.K. Mohamed had resided in South Africa for over a year at the time of his arrest. For much of that period he was gainfully employed, and in fact his employer (who was also a friend and housemate), after finding out about the arrest, explored the possibility of retaining an attorney on behalf of K.K. Mohamed, only to be dissuaded by immigration officers of the South African Department of Home Affairs. As for Al-'Owhali, at the time of his arrest he possessed $800 in U.S. currency, a sizeable sum in Kenya. There is no indication that these funds, or their equivalent, would not have been available to Al-'Owhali for purposes of retaining counsel.

The AOR is flawed in its message that, despite being interrogated by U.S. law enforcement, Defendants only had a right to the assistance and presence of counsel if they were physically inside the United States. We find this to be an inaccurate representation of what truly was available to Defendants under South African and (to a lesser extent) Kenyan law. The result of this erroneous advice of rights was that Defendants were presented with an unduly constrained range of choices: They could either (1) remain silent or (2) go on to answer the American officials' questions without an attorney present. Conspicuously absent was the right to counsel before and during interrogation, a right *Miranda* itself underscores as paramount and vital for those who suddenly find themselves alone inside a police interrogation room.

With respect to Defendants, the problem is considerably more severe. Rather than make no representation at all concerning the right to counsel, the Government made an entirely faulty one. The right to counsel was made to seem dependent on geography, when instead it actually hinged on foreign law. And as described above, that premature foreclosure ran counter to the availability of counsel as it exists under both South African and Kenyan law.[22]

---

21. Due to our resolution of the issues, we have no occasion to address whether, in an ex post attempt to cure a deficient AOR, the Government must have had concurrent knowledge—i.e., at the time the AOR was actually administered—that a defendant's access to counsel during overseas interrogation would have been impossible under foreign law or according to the factual circumstances.

22. Nor is *Duckworth v. Eagan*, 492 U.S. 195, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989), to the contrary. There, the Supreme Court found permissible an advice of rights that stated: "We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court." (*Id.* at 198, 109 S.Ct. 2875.) Several factors render *Duckworth* inapposite. First, the suspect in *Duckworth* was still advised that he had "a right to talk to a lawyer before we ask you any questions, and to have him with you during questioning." (*Id.*) The existence of this right was never conditioned, as here, on geography. Second, the "if and when" construction in *Duckworth* accurately described the future point in time at which appointed counsel would be available in Indiana. (*Id.* at 204, 109 S.Ct. 2875.) In this case, however, the AOR misinformed Defendants of their current opportunity to access counsel while being interrogated in Kenya and South Africa.

The remaining cases relied upon by the Government are similarly distinguishable. In both *United States v. Dopf*, 434 F.2d 205 (5th Cir.1971), and *Cranford v. Rodriguez*, 512 F.2d 860 (10th Cir.1975), the courts seem to

Therefore, we hold that the AOR, on its face, is inadequate under *Miranda* and its progeny.[23]

### 2. *Defendant Al-'Owhali*

■ The deficient AOR was used to apprise Al-'Owhali of his rights for the first five interrogation sessions. Although he himself could not read the English-language AOR, it was read aloud to him in Arabic, his native language, only once. Thereafter, the AOR was not re-read to Al-'Owhali again, but only shown to him in order to refresh his recollection. At no other time during these first five sessions did any U.S. or Kenyan personnel orally elaborate or explain to Al-'Owhali what his rights were during the interrogations. Because we find the AOR, standing alone, to be insufficient under *Miranda*, all statements elicited during these interrogation sessions—August 12, 13, 14, 17, and 21— are hereby suppressed.

### (a) *Curing the Deficient AOR*

■ By the sixth interrogation session, however, Al-'Owhali had made it clear that he was willing to inculpate himself in the embassy bombing in exchange for some kind of guarantee from the Americans that any criminal trial would take place in the United States instead of Kenya. At the start of the August 22 session, in anticipation of any statements forthcoming that day, AUSA [redacted] presented Al-'Owhali with a document of understanding ("DOU") setting forth in detail the various understandings between Al-'Owhali and his interrogators. Al-'Owhali then made an offhand remark that perhaps he should have a lawyer review the DOU to ascertain its enforceability.[24] At this point, AUSA [redacted] exercised due caution by orally apprising Al-'Owhali of his rights. Al-'Owhali was told that he had the right to remain silent, that anything he said could be used against him in court, and that he had the right to the presence of an attorney "during this meeting," although an American attorney was currently unavailable. Al-'Owhali was additionally told that his silence could not be used against him in court, and that even if he decided to talk now he could still change his mind later. AUSA [redacted] further stressed that he was an attorney for the U.S. government, not for Al-'Owhali. Throughout it all, Al-'Owhali was reminded repeatedly that he was the "boss" as to whether he wanted to answer questions without a lawyer present.

AUSA [redacted]'s oral advice of rights cured the deficient AOR. We found in Subsection III.B.1 *supra* that the AOR was flawed in its message that the right to counsel during an interrogation by U.S. agents was geographically based, especially since it remained a possibility that Kenyan authorities would have permitted a retained Kenyan lawyer to enter the stationhouse. For the August 22 session, however, Al-'Owhali was *explicitly apprised* that he had the right to the presence of an attorney for purposes of the ensuing conversations. The only qualification placed on this right was the current unavailability of an American lawyer. But this was entirely true given the fact that the parties were not in the United States and were not in any position to instantly

accept as true the blanket assertion that access to counsel was never possible under the circumstances.

**23.** The Government additionally argues for some sort of good faith exception to an erroneous AOR. Whatever the merits of this theory when a particularized AOR is authored only after a detailed inquiry into a specific nation's law, it certainly has no application to the cookie-cutter AOR at issue here—one that is apparently used by the FBI, without revision, in *every* foreign nation. (*See also Oregon v. Elstad*, 470 U.S. 298, 317, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) ("The Court in no way retreats from the bright-line rule of *Miranda*. We do not imply that good faith excuses a failure to administer *Miranda* warnings . . . .").)

**24.** We do not consider this an express invocation of the right to counsel. (*See Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (finding no request for counsel in remark: "Maybe I should talk to a lawyer").)

produce an American court-appointed attorney. At the same time, no limits were expressed as to Al-'Owhali's ability to retain Kenyan counsel if he wished to do so. We thus conclude that AUSA [redacted]'s oral advice of *Miranda* rights on August 22 cured the deficiency in the AOR so that, beginning on August 22, Al-'Owhali was apprised of his rights in compliance with the requirements of *Miranda*. (*See Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); *United States v. Yousef*, 925 F.Supp. 1063, 1075 (S.D.N.Y. 1996).)

*(b) Waiver*

■ We further find, by a preponderance of the evidence, that Al-'Owhali made a valid waiver of his *Miranda* rights on and after the August 22 session. His waiver was knowing and intelligent in that all conversations and documents touching upon his rights were translated to him in his native language by qualified interpreters. AUSA [redacted] explained these rights fully, carefully, and repetitively. Al-'Owhali never expressed that he was having difficulty understanding what was being told him. Even apart from his many oral waivers, Al-'Owhali signed two different DOUs, both of which state: "I ... have been fully advised of my rights, including my right to remain silent and my right not to answer questions without a lawyer present." Al-'Owhali's behavior during the interrogations subsequent to August 22 made it clear that he was quite aware who was the "boss" as to whether statements would or would not be made without a lawyer present.

Viewing the totality of the circumstances, we additionally conclude that Al-'Owhali's waiver was voluntary. His decision to talk was not the product of any duress, threat, promise, or coercion by his interrogators. The individual sessions were intermittent and reasonable in duration; handcuffs were never used. Throughout the interviews, Al-'Owhali was given breaks for prayer, restroom use, and food. Al-'Owhali, moreover, is a well-educated and intelligent individual. His demeanor before the Americans was one indicative of confidence, not of intimidation.[25] That his inculpatory admissions were preceded by a period of incommunicado detention is not by itself dispositive. First, such post-arrest detention of murder suspects is authorized under Kenyan law and it was the Kenyans who retained physical custody of Al-'Owhali. Second, the conditions of confinement, although non-ideal, were far from oppressive. Third, we have found no reason to believe that any of the Kenyan or U.S. law enforcement who came into contact with Al-'Owhali abused or mistreated him in any way. His needs—dietary, medical, and religious—were met and Al-'Owhali made no contemporaneous complaints to the contrary. And fourth, the interrogation sessions were not of the continuous, around-the-clock variety considered suspect by courts. Every conversation between Al-'Owhali and his interviewers proceeded after it was first clear that he himself wished to speak. Indeed, there is evidence that Al-'Owhali regarded his sessions with S.A. Gaudin as a cat-and-mouse game between trained professionals. (*See* [redacted] Jan. 16, 2001 Aff. ¶ 43 (when S.A. Gaudin confronted Al-'Owhali with inconsistencies in his story, Al-'Owhali remarked, "you're good").)

We have also given due consideration as to the significance, if any, of the following passage in the second DOU, which Al-'Owhali signed:

I have answered a number of questions of the American authorities and have provided truthful information after initially providing incorrect information. However, I have also indicated that there is additional information that I have which I stated I would share with the United States authorities upon my arriving in America and obtaining an attorney.... Because I would otherwise not make this disclosure before arriving

---

**25.** A photograph of Al-'Owhali in his cell, taken at some point during his U.S. interrogation in Kenya, shows him smiling and striking a triumphant pose. (Gov't Ex. 9A.)

in the United States and speaking to an attorney, but because American authorities do not wish to take the risk that the delay concerning the information I intend to impart later will cause loss of life, it is hereby agreed that I will tell the United States authorities about this information prior to returning to America.

In our initial (and since-withdrawn) opinion granting suppression, we thought Al-'Owhali's statements to be the product of a "Hobson's choice" that supposedly pitted his continued silence in Kenya against his access to an American attorney. Now, after considering the added evidence submitted by the Government at the renewed suppression hearing, we believe that what truly motivated Al-'Owhali to inculpate himself was his own overriding desire that he be tried in the United States. As he declared to the U.S. agents interviewing him, it was the United States which was his enemy, not Kenya. Particularly significant is the fact that the suggestion that he be tried in America was initiated entirely by Al-'Owhali. And when Al-'Owhali was dissatisfied by the less-than-firm assurances offered in the first DOU, he demanded that AUSA [redacted] do better. All of the above confirms our belief that Al-'Owhali's decision to waive his rights and confess to the Americans was a decision borne of his own volition. We hold that statements made by Al-'Owhali to U.S. law enforcement in Kenya on or after August 22 are admissible.[26]

### 3. Defendant K.K. Mohamed

■ K.K. Mohamed moves to suppress statements he made to U.S. law enforce-

ment while in the custody of South African officials.[27] He bases his motion purely on the legal claim that the AOR used by the Americans was facially deficient under Miranda. No allegations of coercion, involuntariness, or invalid waiver have been made. Although K.K. Mohamed is correct that the AOR, standing alone, is deficient—indeed, we reach that very conclusion above—we find suppression in this situation nevertheless unwarranted. We first point out that the reason we found the AOR problematic was that it prematurely foreclosed an option that might have been available under foreign law, i.e., the right to counsel inside a foreign stationhouse. Here, however, K.K. Mohamed was twice affirmatively apprised of his right to counsel under South African law. He was told at the time of his arrest that he was entitled to legal representation if he so wished. And at the start of his first interrogation, South African officers notified him again that he was entitled to counsel. By the time U.S. agents began their own interviews of K.K. Mohamed later that day, any deficiency in the AOR as to his right to counsel under foreign law had already been cured by the actions of South African officers earlier that morning. We therefore deny K.K. Mohamed's motion to suppress.[28]

### IV. Motion To Suppress Custodial Statements: Vienna Convention

Al-'Owhali seeks suppression of his statements on the alternative ground that

---

**26.** Even if the relevant standard were due process, the considerations we describe herein would still lead us to find that Al-'Owhali's confession was voluntary. (See Dickerson, 530 U.S. 428, 120 S.Ct. at 2336 (" 'Cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare.' ") (quoting Berkemer v. McCarty, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)).)

**27.** To be clear, K.K. Mohamed also made statements to South African officers in South Africa and to U.S. agents outside of South Africa. Neither were the subject of K.K. Mohamed's motion to suppress.

**28.** On January 29, 2001, the Court preliminarily indicated from the bench that K.K. Mohamed's suppression motion might be denied as untimely. Our rejection, on the merits, of that motion obviates the present need to rule definitively on the timeliness issue.

the American agents who interrogated him failed to advise him of his right to contact his consulate as required by the Vienna Convention.[29] (Al-'Owhali Mot. at 24—27.) He also claims that, when he inquired about the possibility of contacting an embassy representative, he was told that "no one would ever come." (*Id.* at 25.) According to Al-'Owhali, the Government's failure to inform him of his right to request assistance from the Saudi Arabian embassy deprived him of the advice of an embassy representative, whom Al-'Owhali posits would likely have advised him of his right to consult an attorney. (*Id.* at 27.) For purposes of this motion, the Court assumes both that Al-'Owhali has a private right of action under the Vienna Convention[30] and that this right was infringed by the Government's failure to inform him of his right to contact his embassy.[31] The Court nonetheless finds that, for several reasons, the law does not afford Al-'Owhali the remedy he seeks. This aspect of Al-'Owhali's motion is therefore denied.[32]

Numerous courts have established that a violation of the right to consular notification does not implicate fundamental constitutional rights. (*See Waldron v. I.N.S.*, 17 F.3d 511, 518 (2d Cir.1994); *Polanco v. United States*, 2000 WL 1072303, *6 (S.D.N.Y.2000) ("[A] violation of the Vienna Convention's consular notice provision does not constitute a constitutional violation or a fundamental defect in the conduct of [defendant's] trial."); *see also Murphy v. Netherland*, 116 F.3d 97, 100 (4th Cir.1997); *United States v. Rodrigues*, 68 F.Supp.2d 178, 183 (E.D.N.Y. 1999).) As a result, Al-'Owhali is required to demonstrate the prejudice that he suffered as a consequence of the violation of his right to consular notification. (*See*

29. Article 36 of the Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77, requires:

> 1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:
> . . .
> (b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph.

30. In its decision in *Breard v. Greene*, 523 U.S. 371, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998), the Supreme Court explicitly left this question open, explaining that the Vienna Convention "arguably confers on an individual the right to consular assistance following arrest." (*Id.* at 376, 118 S.Ct. 1352.) Many courts since *Breard* have likewise avoided "wad[ing] into the morass" by proceeding on the assumption that a private right of action in fact exists. (*United States v. Salameh*, 54 F.Supp.2d 236, 279 (S.D.N.Y.1999); *see also United States v. Page*, 232 F.3d 536, 540 (6th Cir.2000), *peti-*

*tion for cert. filed*, (U.S. Jan. 3, 2001) (No. 00–7751); *United States v. Lawal*, 231 F.3d 1045, 1047–48 (7th Cir.2000), *petition for cert. filed*, (U.S. Jan. 22, 2001) (No. 00–8105); *United States v. Carrillo*, 70 F.Supp.2d 854, 859 (N.D.Ill.1999); *United States v. Kevin*, 1999 WL 194749, *3 (S.D.N.Y.1999). *But see United ed States v. Rodrigues*, 68 F.Supp.2d 178, 182 (E.D.N.Y.1999) (citing cases for the proposition that Article 36 does create standing).)

31. The Court assumes the application of the Vienna Convention in this unusual circumstance—where the defendant was in Kenyan and not American custody—without deciding the question of whether a defendant who is interrogated by American officials while in the custody of a foreign government can assert that the Americans violated the Convention. The language of section 1(b) suggests that the obligation to inform a detainee's consulate lies with officials of the state in whose custody the foreign national is kept. Because the Court does not need to answer this question to resolve Al-'Owhali's motion, the question is reserved for another day.

32. In an opinion issued January 2, 2001, the Court denied a similar motion by Defendant K.K. Mohamed who asserted that the Government's failure to advise him of his rights under the Vienna Convention required dismissal of the Government's death penalty notice. (*United States v. Bin Laden*, 126 F.Supp.2d 290, 295–96 (S.D.N.Y.2001).)

*Murphy,* 116 F.3d at 100–01; *Faulder v. Johnson,* 81 F.3d 515, 520 (5th Cir.1996); *United States v. Chanthadara,* 230 F.3d 1237, 1256 (10th Cir.2000); *United States v. Salameh,* 54 F.Supp.2d 236, 279 (S.D.N.Y.1999); *United States v. Kevin,* 1999 WL 194749, \*4 (S.D.N.Y.1999); *Rodrigues,* 68 F.Supp.2d at 183.)

■ Al-'Owhali claims that, if properly notified, he would have availed himself of the right to consular notification and thus would, in all likelihood, have been advised by a Saudi Arabian embassy representative of his right to consult with counsel. On its face, this claim of prejudice is highly speculative. (*See Breard v. Greene,* 523 U.S. 371, 377, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998) (rejecting claim where showing of prejudice was overly speculative).) The Court notes that Al-'Owhali *was* apprised by the Kenyan police of the right to consular notification prior to the August 20, 1998 identification parade on, at which time he, still claiming to be a *Yemeni* national, requested that the *Yemeni* embassy be contacted.[33] Until he revealed his actual identity (and his Saudi citizenship) on August 22, it is not apparent to the Court that he would have availed himself of the right to have the *Saudi* embassy contacted. And the Court has already established that, as of August 22, 1998, the Government properly advised Al-'Owhali of his *Miranda* rights. Given that, it is not clear what additional assistance an embassy representative would have provided in this regard. (*See Rodrigues,* 68 F.Supp.2d at 184 ("Prejudice has never been—nor could reasonably be—found· in a case where a foreign national was given, understood, and waived his or her *Miranda* rights. Courts have uniformly found that no prejudice can exist in that situation, because the advice a consular official would give would simply augment the content of *Miranda,* which the foreign national has already waived.").) In addition, nothing in the text of the Vienna Convention requires that police interrogation be suspended once a suspect requests consular notification. (*See United States v. Lombera–Camorlinga,* 206 F.3d 882, 886 (9th Cir.2000), cert. denied, —— U.S. ——, 121 S.Ct. 481, 148 L.Ed.2d 455 (2000); *Rodrigues,* 68 F.Supp.2d at 184.)

Al-'Owhali's claim also fails because the remedy he seeks is unavailable. Courts have routinely held that suppression of a defendant's statements is not an appropriate remedy for a violation of the Vienna Convention. (*See United States v. Li,* 206 F.3d 56, 61 (1st Cir.), *cert. denied,* —— U.S. ——, 121 S.Ct. 378, 148 L.Ed.2d 292, (2000); *United States v. Page,* 232 F.3d 536, 540 (6th Cir.2000); *United States v. Lawal,* 231 F.3d 1045, 1047–48 (7th Cir. 2000); *Lombera–Camorlinga,* 206 F.3d at 887; *United States v. Carrillo,* 70 F.Supp.2d 854, 860–61 (N.D.Ill.1999); *Salameh,* 54 F.Supp.2d at 279; *Rodrigues,* 68 F.Supp.2d at 185.) In so holding, several courts have relied, in part, upon the State Department's published interpretation of the Vienna Convention; it outlines the remedies which are available for the failure to advise someone of his right to consular notification. According to the State Department, "[t]he only remedies for failures of consular notification under the Vienna Convention are diplomatic, political, or exist between states under international law." (*Li,* 206 F.3d at 63 (citation omitted); *see also Lombera–Camorlinga,* 206 F.3d at 887 ("The State Department indicates that it has historically enforced the Vienna Convention itself, investigating reports of violations and apologizing to foreign governments and working with domestic law enforcement to prevent future violations when necessary."); *Rodrigues,* 68 F.Supp.2d at 186 ("According to the State Department, all signatory countries remedy breach of Article 36's notification

---

**33.** For reasons which have not been presented to the Court, the Yemeni embassy declined to send a representative.

provision through traditional diplomatic, not judicial, channels.").)

## V. MOTION TO SUPPRESS WITNESS IDENTIFICATION

 Chapter 46 of the Kenya Police Force Standing Orders provides for an "identification parade." It is a lineup procedure whereby a suspect is placed among at least eight other persons of similar appearance and a witnesses is asked to attempt a positive identification. (Gov't Ex. 5.) Witnesses are required to "actually touch" the person that they recognize. (*Id.*) On August 20, 1998, during an identification parade conducted by the Kenyan CID, an eyewitness to the bombing identified Defendant Al-'Owhali as the passenger in the truck which carried the bomb to the American embassy in Nairobi. Al-'Owhali seeks suppression of this identification evidence because he claims that the lineup was overly suggestive.[34] According to Al-'Owhali, at the time of the lineup, he had visible wounds on his face and hands, as well as blood stains on his clothes. (Cohn Aff. at 15–16.)

Under the Federal Rules of Evidence, identification evidence is generally admissible. (Fed.R.Evid.801(d)(1)(C) (characterizing as "not hearsay" evidence of a prior statement "of identification of a person made after perceiving the person").) Evidence of a prior identification will be excluded "only if the procedure that produced the identification is 'so unnecessarily suggestive and conducive to irreparable mistaken identification that the defendant was denied due process of law.'" (*United States v. Bautista*, 23 F.3d 726, 729 (2d Cir.1994) (quoting *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967)), *overruled on other grounds*,

*Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).) As the Supreme Court has explained, "[s]uggestive confrontations are disapproved because they increase the likelihood of misidentification." (*Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).) Identification evidence that is the product of an overly suggestive procedure may still be admissible if "under the 'totality of the circumstances' the identification was reliable." (*Id.* at 199, 93 S.Ct. 375.) However, if a court determines that an identification procedure was not suggestive, "independent reliability is not a constitutionally required condition of admissibility, and the reliability of the identification is simply a question for the jury." (*Jarrett v. Headley*, 802 F.2d 34, 42 (2d Cir.1986).)

The Court has reviewed several photographs of the participants in the identification parade and finds that the eight stand-ins physically resembled Al-'Owhali in their skin color, the length and color of their hair, their facial hair (all appear to have some sort of moustache), their approximate heights, the manner of their dress and their apparent ages. (Gov't Exs. 6A–6J.) Al-'Owhali was not handcuffed or in any other way distinguishable from the other participants in the lineup. In addition, the Court has examined the clothes that Al-'Owhali wore during the identification parade. (Def.Exs.C–D.) The Court finds that, while there appear to be a few stains which may have been on the clothes at the time of the identification parade, these stains are small and not obvious. In and of themselves, they certainly would not have made the procedure suggestive.[35] Indeed, as the Government asserts (Gov't Jan. 17, 2001 Ltr. to the

---

**34.** In his letter to the Court of January 12, 2001, counsel for Al-'Owhali additionally objects to the identification procedure as violative of Kenyan law. The basis for this contention is unclear and has not been briefed in any of the papers submitted to the Court. Indeed, we have not even been apprised of how Kenyan law was supposedly violated.

We find that there is no basis for relief on this contention.

**35.** The stains are not apparent in the photographs of the identification parade, but that may be a consequence of the quality of the photographs.

Court at 3), the clothing worn by Al-'Owhali during the parade could not have been exceedingly suggestive when only one of the six witnesses who participated in the identification parade was actually able to identify Al-'Owhali. (*See United States v. Arrington*, 159 F.3d 1069, 1072 (7th Cir. 1998) ("That the lineups were not unduly suggestive is best exemplified by the fact that two tellers identified someone other than Arrington as the robber.").) Finally, the Court notes that Al-'Owhali made no mention of the blood stains when, immediately following the identification parade, he was given an opportunity by the Kenyan CID to raise any objection to the manner in which the identification procedures had been conducted. (Gov't Ex. 5.) The facts presented do not approach the degree of suggestiveness that is required to suppress identification evidence. (*See Brayboy v. Scully*, 695 F.2d 62, 65 (2d Cir.1982) (collecting and describing cases which have found impermissible suggestiveness).) Because we find that the procedure was not suggestive, it is not necessary to consider the reliability of the identification. (*See Jarrett*, 802 F.2d at 42; *Brayboy*, 695 F.2d at 65.) Al-'Owhali's motion to suppress the identification evidence is denied.

## VI. CONCLUSION

For all of the foregoing reasons, Defendant Al-'Owhali's motion to suppress is granted in part and denied in part, whereas K.K. Mohamed's motion to suppress is denied in its entirety.