**UNITED STATES of America,**

v.

**Mohamed Rashed Daoud AL-'OWHALI, Defendant.**

**No. S(7)R98 Cr. 1023(KTD).**

United States District Court, S.D. New York.

Feb. 9, 2010.

*MEMORANDUM & ORDER*

KEVIN THOMAS DUFFY, District Judge.

### INTRODUCTION

Mohamed Rashed Daoud al-'Owhali was convicted of numerous terrorism-related crimes on May 29, 2001, after a five-month jury trial before the Honorable Leonard B. Sand. Al-'Owhali's conviction stems from his activities with al Qaeda during his participation in the 1998 synchronized attacks on the United States Embassies in Dar-es–Salaam, Tanzania and Nairobi, Kenya (the "Bombings"). Based on these convictions, al-'Owhali was sentenced to life in prison.

Al-'Ohwali had been injured in the bombing at Nairobi and had been hospitalized there to treat his injuries. He was arrested by was kept in the custody of the Criminal Investigation Division of the Kenyan National Police ("CID") but was also questioned by agents of the U.S. Government. This interrogation originally started in English, but the agents soon decided to use an interpreter. The first interpreter the agents obtained translated during the first three days of al-'Owhali's interrogation. As part of its own investigation, the Kenyan CID held an "identification parade" in which a witness identified the defendant as a participant in the Bombings. The U.S. government agents also continued their investigation and, after nine days, confronted al-'Owhali with some of the evidence that had been collected against him. At that point, al-'Owhali agreed to tell the truth about his involvement in the Bombings. The next day, after receiving *Miranda* rights and obtaining assurances that he would be tried in a U.S. court, the defendant gave his real name and identity for the first time, and

he confessed to his participation in the Bombings, long after the first interpreter had been replaced by a Federal Bureau of Investigation ("FBI") Language Specialist. This confession and the other statements made by the defendant over the next several days played a major role in his trial and conviction.

Al-'Owhali appealed the entire matter, including the denial of his original motion for the suppression of evidence, to the Second Circuit on October 19, 2001. On November 24, 2008, the Second Circuit affirmed al-'Owhali's conviction, rejecting his arguments that his confession was involuntary based on the same reasoning in the opinion of this court. See *In re Terrorist Bombings of U.S. Embassies in East Africa ("In re Terrorist Bombings")*, 552 F.3d 177, 213–14 (2d Cir.2008), *aff'g United States v. Bin Laden*, 132 F.Supp.2d 168 (S.D.N.Y.2001).

### *THIS MOTION*

On or about December 12, 2008, the United States Attorney's Office for the Southern District of New York advised al-'Owhali that it had a summary report of a recent interview of the interpreter who worked during the first three days of al-'Owhali's interrogation after his arrest in Kenya (the "Interpreter"). The summary report indicated that the Interpreter had made statements during the interview contrary to what was shown at the suppression hearings and at trial. Due to the disclosure of this redacted summary report of the interview conducted by a contract employee, al-'Owhali sought remand of his appeal from the Second Circuit on the sole issue of voluntariness.

The Second Circuit granted his request on April 30, 2009. On the basis of this newly discovered evidence, al-'Owhali now requests that I vacate the findings of Judge Sand on the voluntariness of al-'Owhali's confession; suppress all confessions he made to the Government while in Kenya; and grant any other relief required under the circumstances.

### *BACKGROUND*

The Bombings of the two U.S. Embassies occurred on August 7, 1998. Two officers of the Kenyan CID arrested al-'Owhali at approximately 10:00 a.m. on August 12, 1998. Upon arrest, al-'Owhali falsely identified himself as "Khalid Salim Saleh Bin Rashed" and represented that he was from Yemen. Found on his person were $800 in U.S. currency, some Kenyan currency, and a hospital stub showing that al-'Owhali had received medical treatment on August 7, 1998, the day of the Bombings. Al-'Owhali had cuts and abrasions on his wrist and elsewhere as a result of his role in the Bombings.

Al-'Owhali was transported from his hotel, where he was apprehended without incident, to CID headquarters in Nairobi. At approximately 11:00 a.m. on August 12, 1998, al-'Owhali's interrogation began in English. Present for the initial interrogation were, in relevant part, FBI Special Agent Gaudin, New York City Police Detective Parola (both members of the Joint Terrorist Task Force based in New York City), and the two CID officers. This first session continued for about an hour in English, but due to communication difficulties, Agent Gaudin determined that an Arabic interpreter would be preferable. Accordingly, Agent Gaudin suspended the interview and procured a government interpreter employed by a U.S Government agency other than the FBI who agreed to interpret al-'Owhali's interrogation. This interpreter is the "Interpreter" referred to above. This interpreter worked only the first three days of al-'Owhali's interrogation, being replaced by FBI Language Specialist Feghali. Al-'Owhali made no

incriminating statements during the first three days when the Interpreter was present.

On August 20, 1998, much after the Interpreter had left, as part of its own investigation, the CID conducted an "identification parade" whereby witnesses to the Bombings were asked to identify potential suspects out of a group of eight men of similar height and build. One witness identified al-'Owhali. On August 21, 1998, the FBI fingerprinted al-'Owhali for the first time since his arrest. Then, after the Government agents told al-'Owhali about all the evidence that had already been amassed against him, al-'Owhali finally indicated that he was willing to tell the truth about his involvement in the Bombings.

On August 22, 1998, an Assistant United States Attorney ("AUSA") advised al-'Owhali of his *Miranda* rights in the presence of two FBI agents, two CID agents, and FBI Language Specialist Feghali. Before deciding whether to waive his rights and confess his role in the Bombings, al-'Owhali demanded to be tried in the United States. After receiving reasonable assurance that he would be tried in this country, al-'Owhali stated more than once that he was comfortable proceeding without an attorney present. Only then did al-'Owhali reveal his true name and nationality and proceed over the next four days to inculpate himself in the Bombings.

In determining that al-'Owhali's confession was voluntary and denying his motion to suppress the incriminating statements that he made during his interrogation in Kenya on or after August 22, 1998, Judge Sand made several factual findings, including that: (1) al-'Owhali was never handcuffed during any of his interviews in Kenya; (2) all interviews took place in a library-like room; (3) frequent food, bathroom, and prayer breaks were taken; (4) al-'Owhali could get bottled water upon

request and food often from the agents; (5) no threats or promises were made by the U.S. agents; (6) al-'Owhali was held incommunicado for fourteen nights, as permitted under Kenyan law; (7) al-'Owhali received medical care as needed for the wounds he sustained as a result of his role in the Bombings; and (8) al-'Owhali was a well-read, intelligent person with two years of university education, significant military experience, a familiarity with political and world events, and who had a basic understanding of spoken English. *See Bin Laden*, 132 F.Supp.2d at 178–79. The Second Circuit affirmed al-'Owhali's conviction and the district court's findings that al-'Owhali's confession was voluntary, stating, "All of this evidence [as set out above] militates powerfully against the potentially coercive effects of [al-'Owhali's] detention and in support of the findings of the District Court." *In re Terrorist Bombings*, 552 F.3d at 214.

### ANALYSIS

The starting point for our inquiry is the summary report of the interview of the Interpreter by the Government contract employee. Luck would have it that we had a videotape of the interview that was viewed by counsel and the court. Because the object of the interview had little or nothing to do with this case or with law enforcement by any stretch, the video was never marked in evidence and was turned back to the agency that was its custodian. The very few portions of the tape that are relevant to this matter are discussed below. I am sure that if some reviewing court wishes to see the video that the Government will make a viewing available.

On the basis of that viewing and the various documents submitted at the hearings conducted herein, it is crystal clear that the report was grossly inaccurate and

warped what the Interpreter actually said. The Government contract employee who conducted the interview testified that he prepared the report some time after the interview from memory and some sketchy notes. He tried to pass these inaccuracies off as mere lapses of memory and mistakes. It is unnecessary for me to speculate as to the reasons that these mistakes were made. The end result, however, is that the supposed statements of the person being interviewed contained in the report never happened in real life.

Having made this finding, it is clear that the disposition of this matter is quite simple and compelling. But I believe that it is well to point up some of the many other reasons why the motion must be denied.

### Voluntariness in Light of the Summary Report

■ As written, the redacted summary report read in the light most favorable to al-'Owhali could be understood to show that he was physically abused or tortured. However, al-'Owhali does not now, nor has he ever, alleged that he was physically mistreated in any way or that any such physical abuse coerced his confession. And, as already noted, the redacted summary report that the Government turned over to al-'Owhali was materially inaccurate. In relevant part, based on the videotape and a transcript of the interview, the following portions of the report are just wrong.

First, the redacted report said that the Interpreter "stated she believed that from sounds emanating from the interrogation room, [al-'Owhali] was being beaten." In a

sworn declaration and in sworn testimony before me, the contract employee who wrote the report has confirmed what my own viewing of the video of the interview revealed: the Interpreter never said that she believed al-'Owhali was being beaten. Rather, as the contract employee has since acknowledged, in response to his question asking whether she thought al-'Owhali was being beaten, the Interpreter refused to speculate, stating, "You know what, ... I heard the banging but I didn't see it .... So I cannot tell you something I did not see." This material difference reflects more than just an inadvertent inaccuracy; it presents a reckless misrepresentation.

Second, the redacted report says that: "At one point, [the Interpreter] stated that [al-'Owhali] shouted to her, 'sister, please make them stop beating me.' [The Interpreter] stated she was terrified and ran from the room. [The Interpreter] was later convinced, to resume her duties as an interpreter ...." This statement as recorded in the contract employee's report is a damning, but completely erroneous, snapshot of a sequence of events that actually occurred much differently.

In reality, the Interpreter said that she heard banging,[1] along with what she characterized as the agents playing "bad cop good cop", and ran from the room where al-'Owhali's interrogation was taking place, the library of CID headquarters. The video shows that she further told the contract employee, "I thought, my God, this guy [al-'Owhali] is going to come out and he is going to find out who am I." What is clear after watching the video and reviewing all the relevant documents is that the Inter-

---

1. Al-'Owhali and Detective Parola consistently recalled that one of the agents slapped a bottle of water from the table in front of al-'Owhali up against the wall or onto the floor during his interrogation while the Interpreter was present. (Al-'Owhali Aff. ¶ 9, Oct. 14, 2000, Gov't's Mem. Ex. A; Brown Aff. ¶ 7, Aug. 13, 2009, Gov't's Mem. Ex. O). The Interpreter has said that the sounds she heard were consistent with an object being thrown up against the wall or a person slamming his hand down on the table. (Brown Aff. ¶ 8) (attesting to the recollection of now U.S.D.J. Ken Karas.)

preter was afraid of al-'Owhali for her own life and safety, not that she had any concern for his safety. Outside the room, the Interpreter was assured that everything was under control, and she reentered prepared to resume interpreting the interrogation. She told the contract employee that when she returned to the library, she remembered al-'Owhali saying "sister, sister, please tell them to stop beating me." [2] In the video, she calmly recalled that she translated his words, reflecting no genuine concern that he had in fact been beaten.

Once again, considered after a complete viewing of the videotaped interview with the Interpreter, conducting several hearings, and carefully reviewing the relevant documents, I conclude that the picture painted by the redacted report is inaccurate at best. It is important that the reader remember that al-'Owhali did not claim during the suppression hearings, nor does he now, that he was coerced into confessing by torture or beatings. I find nothing in the redacted summary report or in the underlying interview of the Interpreter to upset Judge Sand's prior determination of voluntariness, already affirmed by the Second Circuit. I remain convinced that:

> what truly motivated [a]l-'Owhali to inculpate himself was his own overriding desire that he be tried in the United States. As he declared to the U.S. agents interviewing him, it was the United States which was his enemy, not Kenya. Particularly significant is the fact that the suggestion that he be tried in America was initiated entirely by [a]l-'Owhali. And when al-'Owhali was dissatisfied by the less-than-firm assurances offered in the first [document of

understanding], he demanded that AUSA [redacted] do better. All of the above confirms our belief that [a]l-'Owhali's decision to waive his rights and confess to the Americans was a decision borne of his own volition.

*Bin Laden,* 132 F.Supp.2d at 194. Thus, there is no factual basis for al-'Owhali's motion, and it must be denied.

Further, even if there were factual inconsistencies between what the Interpreter recalled about the treatment of al-'Owhali during the first three days of his interrogation and the testimony that was introduced by the Government at the suppression hearings, they would not matter because al-'Owhali did not make any incriminating statements while the Interpreter was present. And, even if he had, all of al-'Owhali's statements made before receiving his *Miranda* rights on August 22, 1998, were suppressed, *see Bin Laden,* 132 F.Supp.2d at 195, so any hypothetical error would have been harmless. *See United States v. Gambino,* 59 F.3d 353, 364 (2d Cir.1995) (stating that to require a new trial, "newly discovered evidence must be of a sort that could, if believed, change the verdict").

### Alleged Brady Violations

■ In addition to raising the question of voluntariness based on the Government's disclosure of the redacted summary report, al-'Owhali argues that the Government may have neglected its disclosure obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose "information that tends to support the position of the defendant." (Def.'s Mem. 4.) Specifically, al-'Owhali argues that the Government neglected its obligations by failing to disclose

---

**2.** Al-'Owhali denies that he said this. (Cohn Aff. ¶ 6, April 14, 2000, Gov't's Mem. Ex. T.) Rather, he asserts that he begged the agents to stop hurting him when, during the second session of his interrogation, they squeezed the wrist that he injured in the Bombings, which caused some pain that al-'Owhali acknowledges did not amount to torture. (*Id.*)

that: (1) the Interpreter suggested that al-'Owhali had been mistreated when she was interviewed by the Government in 2001 as a prospective witness at the suppression hearings; and (2) there may have been other Government agents present during his interrogation that were not mentioned in the testimony of Agent Gaudin or Detective Parola at the suppression hearings, as can be inferred from the video and transcript of the Interpreters interview.

■■■ To begin, "'the current *Brady* law' imposes a disclosure obligation narrower in scope than the obligation to disclose all evidence favorable to the defendant ...." *United States v. Coppa*, 267 F.3d 132, 141 (2d Cir.2001) (quoting *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). Rather, to trigger the disclosure obligations under *Brady* and its progeny, the defendant must show that the evidence in question: (1) was suppressed, either willfully or inadvertently, by the Government; (2) is favorable to the defendant; and (3) is material to either guilt or punishment. *See Coppa*, 267 F.3d at 140. For *"Brady* purposes, 'evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense', the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Coppa*, 267 F.3d at 141 (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). In practice, this standard "obliges a prosecutor to make a prediction as to whether a reasonable probability will exist that the outcome would have been different if disclosure had been made." *Id.* at 142.

Here, the Government considered the materiality of the Interpreter's 2001 statements in the context of all of the other evidence being offered at the suppression hearings and properly concluded that disclosure was not necessary. The statements at issue come from two interviews of the Interpreter conducted by an AUSA prior to the January 23, 2001, suppression hearing before by Judge Sand. (Brown Aff. ¶ 3.) The Interpreter was apprehensive about testifying because she was afraid that al-'Owhali would learn her identity and her safety would be jeopardized. (Brown Aff. ¶ 4.)

In an interview with an AUSA, the Interpreter nonetheless described the scene of the interrogation much like she did in the videotaped interview. (*Id.* ¶ 5.) The interrogation took place in a room where she was partitioned off by a curtain to shield her identity, so she could hear and be heard but could not be seen or see anything that was happening on the other side. (*Id.*) During this first interview, the Interpreter said "that she heard a loud noise from the adjoining room, which led her to believe that al-'Owhali was being beaten." (*Id.* ¶ 6.) Due to her reluctance to testify and her demeanor, the AUSA conducting the interview thought she may have said this to avoid being called as a witness, and he told her that "all she had to testify to was the truth" because there was not a "version of her story that would preclude or guarantee her testimony." (*Id.*)

The AUSA conducting the interview then consulted with others in the United States Attorney's Office for the Southern District of New York, and the agents who were to testify at the suppression hearing were interviewed separately about the first three days of al-'Owhali's interrogation. (*Id.* ¶ 7.) While they consistently denied that al-'Owhali had been beaten, one of the agents specifically recalled slapping a water bottle and sending it crashing into a wall. (*Id.*) When the AUSA met again

with the Interpreter for a second interview, she no longer claimed that she thought al-'Owhali had been beaten. (*Id.* ¶ 8.) She stated that she did not know what caused the noise, but that it could have been caused by an object being thrown against the wall or someone's fist slamming onto a table. (*Id.*)

Given the Interpreter's clarification, the agents' consistent descriptions of the interrogation, and the fact that al-'Owhali has never claimed that he was beaten, the Government correctly concluded that its *Brady* disclosure obligation had not been triggered. This is especially true because, as stated above, al-'Owhali did not make any incriminating statements during the first three days of his interrogation, the only time the Interpreter was present. In fact, all of al-'Owhali's statements made prior to the oral recitation of his *Miranda* rights on August 22, 1998, were suppressed. Consequently, there is no possibility, let alone a reasonable probability, that the Government's decision not to disclose the Interpreter's recanted statement affected the outcome of the suppression hearing.

I also find no *Brady* violation with respect to the allegation that there may have been other agents present at al-'Owhali's interrogation who were not mentioned during Agent Gaudin and Detective Parola's testimony at the suppression hearings. First, the fact that other Government agents were present at al-'Owhali's interrogation on August 12, 13, and 14, 1998, was not suppressed. While the identities of such agents were concealed, the fact of their presence was revealed in the disclosures made pursuant to the Jencks Act, 18 U.S.C. § 3500. (*See* Gov't's Mem. Exs. H, K, U.)

Further, al-'Owhali has made no showing that the presence of other Government agents would even be favorable to him, let alone material, especially in light of the fact that al-'Owhali has never claimed that the agents known to be present, or any other agents, beat him or physically coerced his confession with torture.

Thus, under these circumstances, al-'Owhali's motion is DENIED.

SO ORDERED.